Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Valley Forge Corporate Center
Eagleville, PA 19403
Phone: 610-271-8050
Fax: 610-271-8057



**VIA FEDEX**

May 29, 2024

Mr. Mark J. Langer, Clerk
United States Court of Appeals
for the District of Columbia Circuit
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001-2866

Re:    Petition for Review

Dear Mr. Langer:

Please find enclosed for filing an original and four copies of a Petition for Review of orders of the Federal Energy Regulatory Commission and Corporate Disclosure Statement of Monitoring Analytics, LLC, acting in its capacity as the Independent Market Monitor for PJM. Copies have been served as indicated on the enclosed Certificate of Service.

Please call me at (610) 271-8053 if you have any questions.

Sincerely,

Jeffrey W. Mayes
General Counsel

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| Independent Market Monitor for PJM, ) | |
| Petitioner, ) | Case No. 24-1164 |
| v. ) | |
| Federal Energy Regulatory Commission, ) | |
| Respondent. ) | |

## PETITION FOR REVIEW

Pursuant to section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b),
Rule 15(a) of the Federal Rules of Appellate Procedure, and Circuit Rule 15,
Monitoring Analytics, LLC, acting in its role as the Independent Market Monitor
for PJM, petitions for review of the following orders of respondent Federal
Energy Regulatory Commission, included as Attachments A and B:

> *Independent Market Monitor v. PJM Interconnection, L.L.C., et al.*, 186 FERC ¶ 61,163 (2024), and

> *Independent Market Monitor v. PJM Interconnection, L.L.C., et al.*, 187 FERC ¶ 62,070 (2024).

Respectfully submitted,

*Jeffrey Mayes*

_____

Jeffrey W. Mayes
General Counsel
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610) 271-8053
*jeffrey.mayes@monitoringanalytics.com*

Dated: May 29, 2024

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| Independent Market Monitor for PJM, ) | |
| Petitioner, ) | |
| v. ) | Case No. 24-1164 |
| Federal Energy Regulatory Commission, ) | |
| Respondent. ) | |

## CORPORATE DISCLOSURE STATEMENT

Monitoring Analytics, LLC, has no parent corporation or publicly traded stock.

Monitoring Analytics, LLC, is the Independent Market Monitor for PJM and performs the market monitoring function for PJM Interconnection, L.L.C. ("PJM"), which is a Regional Transmission Organization (RTO) approved by the Federal Energy Regulatory Commission. *See* 18 CFR § 35.28(g)(3) (2016); PJM Open Access Transmission Tariff Attachment M.

Respectfully submitted,

Jeffrey W. Mayes

General Counsel
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610) 271-8053
*jeffrey.mayes@monitoringanalytics.com*

Dated: May 29, 2024

## CERTIFICATE OF SERVICE

Pursuant to Rules 15(c) and 25 of the Federal Rules of Appellate Procedure, I hereby certify that I have this day served a copy of these documents by first class mail or electronically upon each person designated on the official service list maintained by the Secretary of the Federal Energy Regulatory Commission in the relevant proceedings (included below) and upon the Secretary and the Solicitor of the Federal Energy Regulatory Commission at the following address:

Debbie-Anne A. Reese
Acting Secretary, Office of the Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

Robert H. Solomon
Solicitor
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426
Robert.Solomon@ferc.gov

Dated at Eagleville, Pennsylvania, this 29th day of May, 2024.

Respectfully submitted,

Jeffrey W. Mayes
General Counsel
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610) 271-8053

*jeffrey.mayes@monitoringanalytics.com*

## Service List for EL23-50-000 Independent Market Monitor for PJM v. PJM Interconnection, L.L.C.

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| Advanced Energy United | Michael Haugh<br>Policy Director<br>Advanced Energy United<br>1010 VERMONT AVE NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>mhaugh@advancedenergyunited.org | |
| American Clean Power Association | Gabriel Tabak<br>Counsel<br>American Clean Power Association<br>1501 M St NW<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>gtabak@cleanpower.org | |
| American Council on Renewable Energy | Elise Caplan<br>Director of Electricity Policy<br>American Council on Renewable Energy<br>1150 CONNECTICUT AVE NW STE 401<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>caplan@acore.org | |
| American Electric Power Service Corporation | Jessica Cano<br>Senior Counsel<br>AEP Service Corporation<br>1 Riverside Plaza<br>COLUMBUS, OHIO 43215<br>UNITED STATES<br>jacano@aep.com | Takis Laios<br>Director, Transmission Asset S<br>1 Riverside Plaza<br>Columbus, OHIO 43215<br>tlaios@aep.com |
| American Electric Power Service Corporation | | LaChon Turner<br>AEP COMPANIES<br>801 Pennsylvania, Avenue, NW Suite 735<br>Washington, DISTRICT OF COLUMBIA 20004-2615<br>lturner@aep.com |

| | | |
|---|---|---|
| American Municipal Power, Inc. | Lisa McAlister<br>Deputy General Counsel - FERC/<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OHIO 43229<br>UNITED STATES<br>lmcalister@amppartners.org | Gerit F. Hull<br>Deputy General Counsel - Regul<br>American Municipal Power, Inc.<br>1111 SCHROCK RD STE 100<br>COLUMBUS, OHIO 43229<br>ghull@amppartners.org |
| American Municipal Power, Inc. | | Christopher J Norton<br>Director of Market Regulatory<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OHIO 43229<br>cnorton@amppartners.org |
| Calpine Corporation | Sarah Novosel<br>Senior VP and Managing Counsel<br>Calpine Corporation<br>717 TEXAS ST STE 1000<br>HOUSTON, TEXAS 77002<br>UNITED STATES<br>snovosel@calpine.com | |
| Calpine Corporation | David Scarpignato<br>Calpine Corporation<br>717 Texas Avenue<br>Suite 1000<br>Houston, TEXAS 77002<br>UNITED STATES<br>david.scarpignato@calpine.com | |
| Constellation Energy Generation, LLC | Christopher Wilson<br>Director, Federal Regulatory A<br>Constellation Energy Generation, LLC<br>101 Constitution Ave, NW<br>Suite 400E<br>Washington, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>FERCe-filings1@Constellation.com | William Berg<br>VP, Wholesale Market Developme<br>Constellation Energy Generation, LLC<br>200 Exelon Way<br>Kennett Square, PENNSYLVANIA 19348<br>william.berg@constellation.com |
| Constellation Energy Generation, LLC | Carrie Allen<br>SVP & Deputy General Counsel<br>CONSTELLATION ENERGY<br>CORPORATION<br>101 Constitution Ave. NW Suite 400<br>East | |

| | | |
|---|---|---|
| | Washington, DISTRICT OF COLUMBIA 20001 UNITED STATES carrie.allen@constellation.com | |
| Dayton Power and Light Company, The | William Rappolt Assistant Gen. Counsel, FERC AES Corporation 4300 WILSON BLVD ARLINGTON, VIRGINIA 22203 UNITED STATES william.rappolt@aes.com | Randall Verne Griffin Chief Regulatory Counsel The AES Corporation 1065 WOODMAN DR DAYTON, OHIO 45432 randall.griffin@aes.com |
| Dayton Power and Light Company, The | | John W Horstmann Sr. Director RTO Affairs Dayton Power and Light Company, The 315 Buckwalter Rd Phoenixville, PENNSYLVANIA 19460 john.horstmann@aes.com |
| Delaware Division of the Public Advocate | Regina Iorii Deputy Attorney General Delaware Department of Justice 820 N. French Street, 4th Floor Wilmington, DELAWARE 19801 UNITED STATES regina.iorii@delaware.gov | Ruth A Price Delaware Deputy Public Advocate State of Delaware 820 N. French Street Carvel State Office Building Wilmington, DELAWARE 19801 ruth.price@delaware.gov |
| Delaware Division of the Public Advocate | | Andrea Maucher Public Utilities Analyst Delaware Division of the Public Advocate 29 S STATE STREET ALY DOVER, DELAWARE 19904 andrea.maucher@delaware.gov |
| Dominion Energy Services, Inc. | Cheri Yochelson Assistant General Counsel Dominion Energy Services, Inc. 120 Tredegar Street, RS-5 Richmond, VIRGINIA 23219 UNITED STATES cheri.m.yochelson@dominionenergy.com | James G Davis Regulatory and Market Policy S Dominion Energy & Dominion Generation 120 TREDEGAR ST RIVERVIEW RICHMOND, VIRGINIA 23219 james.g.davis@dominionenergy.com |
| Duquesne Light Company | Michael Zimmerman Sr. Regulatory Counsel | Tishekia E Williams Director of External Affairs a |

| | | |
|---|---|---|
| | Duquesne Light Company<br>411 Seventh Avenue<br>Pittsburgh, PENNSYLVANIA 15219<br>UNITED STATES<br>mzimmerman@duqlight.com | Duquesne Light Company<br>411 Seventh Avenue<br>15th Floor<br>Pittsburgh, PENNSYLVANIA 15219<br>twilliams@duqlight.com |
| Electric Power Supply Association | Nancy Bagot<br>Vice President<br>Electric Power Supply Association<br>1401 NEW YORK AVE NW STE 950<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>NancyB@epsa.org | |
| Enel North America, Inc. | Brian Kauffman<br>Manager of Regulatory Affairs<br>One Marina Park Drive, Suite 400<br>Boston, MASSACHUSETTS 02210<br>UNITED STATES<br>brian.kauffman@enel.com | |
| Energy Trading Institute | Noha Sidhom<br>600 Pennsylvania Ave<br>Suite 300<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>noha@tpcenergyfund.com | |
| Exelon Corporation | Gary Guy<br>Assistant General Counsel<br>Exelon Business Services Company<br>701 Ninth Street, NW<br>Suite 9426<br>Washington, DISTRICT OF COLUMBIA 20068<br>UNITED STATES<br>gary.guy@exeloncorp.com | Jordan Kwok<br>Director<br>Exelon Business Services<br>701 9TH ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>jordan.kwok@exeloncorp.com |
| Exelon Corporation | Alejandro Bautista<br>Exelon Business Services Company, LLC<br>2301 Market St<br>Philadelphia, PENNSYLVANIA 19103<br>UNITED STATES<br>alejandro.bautista@exeloncorp.com | |
| LS Power | Neil Levy | Marjorie R Philips |

| Development, LLC | McDermott Will & Emery LLP 500 North Capitol Street, NW Washington, DISTRICT OF COLUMBIA 20001 UNITED STATES nlevy@mwe.com | VP, Wholesale Market Policy LS Power Associates, L.P. 1700 Broadway, 38th Floor New York, NEW YORK 10019 mphilips@lspower.com |
|---|---|---|
| LS Power Development, LLC | | Tom Hoatson 1 Tower Center East Brunswick, NEW JERSEY 08816 thoatson@lspower.com |
| Maryland Office of People's Counsel | Michael Sammartino Assistant People's Counsel Maryland Office of People's Counsel 6 SAINT PAUL ST STE 2102 BALTIMORE, MARYLAND 21202 UNITED STATES michael.sammartino@maryland.gov | William F. Fields Deputy People's Counsel 6 SAINT PAUL ST STE 2102 BALTIMORE, MARYLAND 21202 william.fields@maryland.gov |
| National Hydropower Association | Michael Purdie National Hydropower Association 601 NEW JERSEY AVE NW STE 660 WASHINGTON, DISTRICT OF COLUMBIA 20001 UNITED STATES michael@hydro.org | |
| New Jersey Division of Rate Counsel | Robert Glover New Jersey Division of Rate Counsel 140 East Front Street 4th Floor Trenton, NEW JERSEY 08625 UNITED STATES rglover@rpa.nj.gov | T. David Wand Division of Rate Counsel New Jersey Division of Rate Counsel 140 E. Front St. 4th Flr. Trenton, NEW JERSEY 08625 dwand@rpa.nj.gov |
| New Jersey Division of Rate Counsel | | Brian O Lipman Acting Director New Jersey Division of Rate Counsel 140 East Front Street 4th Floor Trenton, NEW JERSEY 08625 blipman@rpa.nj.gov |
| New Jersey Division of Rate Counsel | | Debora A Layugan Paralegal New Jersey Division of Rate |

| | | |
|---|---|---|
| | | Counsel<br>140 East Front Stree<br>4th Floor<br>Trenton, NEW JERSEY 08625<br>dlayugan@rpa.nj.gov |
| Northern Virginia Electric Cooperative, Inc. | Alan Robbins<br>Partner<br>Washington Energy Law LLP<br>900 17TH ST NW STE 500-A<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>arobbins@washingtonenergylaw.com | Patrick Toulme<br>Northern Virginia Electric Cooperative,<br>10323 Lomond Drive<br>Manassas, VIRGINIA 20109<br>ptoulme@novec.com |
| Northern Virginia Electric Cooperative, Inc. | Debra Roby<br>Partner<br>Washington Energy Law LLP<br>900 17TH ST NW STE 500-A<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>droby@washingtonenergylaw.com | |
| Northern Virginia Electric Cooperative, Inc. | Thomas Steiger<br>Associate<br>Washington Energy Law LLP<br>900 17TH ST NW STE 500-A STE NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>tsteiger@washingtonenergylaw.com | |
| NUCLEAR ENERGY INSTITUTE | Jonathan Rund<br>Associate General Counsel<br>NUCLEAR ENERGY INSTITUTE<br>Nuclear Energy Institute<br>1201 F Street, NW, Suite 1100<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>jmr@nei.org | Matthew Crozat<br>Senior Director, Business Policy<br>NUCLEAR ENERGY INSTITUTE<br>1201 F Street, NW<br>Suite 1100<br>Washington, DISTRICT OF COLUMBIA 20004<br>mpc@nei.org |
| Old Dominion Electric Cooperative | | Jecoliah R. Williams<br>Attorney<br>Thompson Coburn LLP<br>1909 K Street NW<br>Suite 600<br>WASHINGTON. DISTRICT OF |

| | | |
|---|---|---|
| | | COLUMBIA 20006<br>jwilliams@thompsoncoburn.com |
| Organization of PJM States, Inc. | Gregory Carmean<br>Executive Director<br>Organization of PJM States, Inc.<br>700 Barksdale Road<br>Suite 1<br>Newark, DELAWARE 19711<br>UNITED STATES<br>greg@opsi.us | |
| PJM Interconnection, L.L.C. | Wendy Warren<br>Wright & Talisman, PC<br>1200 G Street, N.W.<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>warren@wrightlaw.com | CRAIG GLAZER<br>V.P., Federal Gov't Policy<br>PJM Interconnection, L.L.C.<br>1200 G ST NW STE 600<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>CRAIG.GLAZER@PJM.COM |
| PJM Interconnection, L.L.C. | Elizabeth Trinkle<br>Wright & Talisman, P.C.<br>Wright & Talisman P.C.<br>1200 G Street NW<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>trinkle@wrightlaw.com | Steven R Pincus, ESQ<br>Assistant General Counsel - Re<br>PJM Interconnection, L.L.C.<br>2750 Monroe Blvd.<br>Audubon, PENNSYLVANIA 19403<br>steven.pincus@pjm.com |
| PJM Interconnection, L.L.C. | Steven Pincus<br>Assistant General Counsel - Re<br>PJM Interconnection, L.L.C.<br>2750 Monroe Blvd.<br>Audubon, PENNSYLVANIA 19403<br>UNITED STATES<br>steven.pincus@pjm.com | CRAIG GLAZER<br>V.P., Federal Gov't Policy<br>PJM Interconnection, L.L.C.<br>1200 G ST NW STE 600<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>CRAIG.GLAZER@PJM.COM |
| PJM Power Providers Group | Glen Thomas<br>1060 First Avenue<br>Suite 400<br>King of Prussia, PENNSYLVANIA 19406<br>UNITED STATES<br>gthomas@gtpowergroup.com | Diane L Slifer<br>101 LINDENWOOD DR STE 225<br>MALVERN, PENNSYLVANIA 19355<br>dslifer@gtpowergroup.com |
| PJM Power Providers Group | | Laura Chappelle<br>6688 FOREST BEACH DR<br>HOLLAND, MICHIGAN 49423<br>laurac@chappelleconsulting.net |

| | | |
|---|---|---|
| PPL Electric Utilities Corporation | Steven Nadel<br>PPL Services Corporation<br>2 North 9th St<br>Allentown, PENNSYLVANIA 18101<br>UNITED STATES<br>SMNadel@pplweb.com | |
| PSEG Power LLC | Viet Ngo<br>Associate Regulatory Counsel<br>Public Service Enterprise Group Incorporated<br>601 NEW JERSEY AVE NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>Viet.Ngo@pseg.com | Ana Murteira<br>Associate Regulatory Counsel<br>PSEG Services Corporation<br>80 PARK PLZ # T10<br>NEWARK, NEW JERSEY 07102<br>ana.murteira@pseg.com |
| PSEG Power LLC | | Robert E. Gardinor<br>Paralegal<br>PSEG Services Corporation<br>80 Park Plaza, T5<br>Newark, NEW JERSEY 07102<br>Robert.Gardinor@pseg.com |
| PSEG Companies | Viet Ngo<br>Associate Regulatory Counsel<br>Public Service Enterprise Group Incorporated<br>601 NEW JERSEY AVE NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>Viet.Ngo@pseg.com | Ana Murteira<br>Associate Regulatory Counsel<br>PSEG Services Corporation<br>80 PARK PLZ # T10<br>NEWARK, NEW JERSEY 07102<br>ana.murteira@pseg.com |
| PSEG Companies | | Robert E. Gardinor<br>Paralegal<br>PSEG Services Corporation<br>80 Park Plaza, T5<br>Newark, NEW JERSEY 07102<br>Robert.Gardinor@pseg.com |
| PSEG Energy Resources & Trade LLC | Viet Ngo<br>Associate Regulatory Counsel<br>Public Service Enterprise Group Incorporated<br>601 NEW JERSEY AVE NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES | Ana Murteira<br>Associate Regulatory Counsel<br>PSEG Services Corporation<br>80 PARK PLZ # T10<br>NEWARK, NEW JERSEY 07102<br>ana.murteira@pseg.com |

| | Viet.Ngo@pseg.com | |
|---|---|---|
| PSEG Energy Resources & Trade LLC | | Robert E. Gardinor<br>Paralegal<br>PSEG Services Corporation<br>80 Park Plaza, T5<br>Newark, NEW JERSEY 07102<br>Robert.Gardinor@pseg.com |
| PUBLIC CITIZEN, INC | Tyson Slocum<br>Energy Program Director<br>Public Citizen's Energy Program<br>215 PENNSYLVANIA AVE SE<br>PUBLIC CITIZEN, INC.<br>WASHINGTON, DISTRICT OF<br>COLUMBIA 20003<br>UNITED STATES<br>tslocum@citizen.org | |
| Public Service Commission of West Virginia | Jacqueline Roberts<br>Federal Policy Advisor, WV Pub<br>West Virginia Public Service<br>Commission<br>201 Brooks Street<br>Charleston, WEST VIRGINIA 25301<br>UNITED STATES<br>jroberts@psc.state.wv.us | |
| Public Service Electric and Gas Company | Viet Ngo<br>Associate Regulatory Counsel<br>Public Service Enterprise Group<br>Incorporated<br>601 NEW JERSEY AVE NW<br>WASHINGTON, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>Viet.Ngo@pseg.com | Ana Murteira<br>Associate Regulatory Counsel<br>PSEG Services Corporation<br>80 PARK PLZ # T10<br>NEWARK, NEW JERSEY 07102<br>ana.murteira@pseg.com |
| Public Service Electric and Gas Company | | Robert E. Gardinor<br>Paralegal<br>PSEG Services Corporation<br>80 Park Plaza, T5<br>Newark, NEW JERSEY 07102<br>Robert.Gardinor@pseg.com |
| Solar Energy Industries Association | Melissa Alfano<br>Manager of Regulatory Affairs<br>Solar Energy Industries Association<br>1425 K Street, N.W., Suite 1000<br>Washington, DISTRICT OF | Ben Norris<br>Manager of Federal Regulatory<br>Solar Energy Industries Association<br>1425 K St NW<br>Washington, DISTRICT OF |

| | | |
|---|---|---|
| | COLUMBIA 20005<br>UNITED STATES<br>malfano@seia.org | COLUMBIA 20005<br>bnorris@seia.org |
| Southern Maryland Electric Cooperative, Inc. | John Rohrbach<br>ED Regulatory<br>ACES POWER MARKETING<br>4140 W 99TH ST<br>CARMEL, INDIANA 46032<br>UNITED STATES<br>JRohrbach@acespower.com | Eugene Bradford<br>Vice President, Rates and Ener<br>SOUTHERN MARYLAND<br>ELECTRIC COOP INC<br>15035 Burnt Store Rd.<br>Hughesville, MARYLAND 20637<br>Eugene.Bradford@smeco.coop |
| Southern Maryland Electric Cooperative, Inc. | | Mark MacDougall<br>Senior Vice President and Gene<br>Southern Maryland Electric Cooperative, Inc.<br>PO Box 1937<br>Hughesville, 20637-1937<br>mark.macdougall@smeco.coop |
| The Office of the Ohio Consumers' Counsel | Denise Goulet<br>Partner<br>McCarter & English, LLP<br>1301 K ST NW<br>SUITE 1000 WEST<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>dgoulet@mccarter.com | Daniel F Shields, JR<br>Manager of Analytical Services<br>Office of the Ohio Consumers' Counsel<br>65 East State Street<br>Suite 700<br>Columbus, OHIO 43215<br>Daniel.Shields@occ.ohio.gov |
| The Office of the Ohio Consumers' Counsel | Keith Layton<br>Assistant Consumers' Counsel<br>Office of the Ohio Consumers' Counsel<br>65 E STATE ST STE 700<br>COLUMBUS, OHIO 43215<br>UNITED STATES<br>keith.layton@occ.ohio.gov | |
| The Office of the Ohio Consumers' Counsel | Denise Goulet<br>Partner<br>McCarter & English, LLP<br>1301 K ST NW<br>SUITE 1000 WEST<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>dgoulet@mccarter.com | |
| The Office of the Ohio | Keith Layton<br>Assistant Consumers' Counsel | |

| | | |
|---|---|---|
| Consumers' Counsel | Office of the Ohio Consumers' Counsel<br>65 E STATE ST STE 700<br>COLUMBUS, OHIO 43215<br>UNITED STATES<br>keith.layton@occ.ohio.gov | |
| UGI Utilities Inc. | Timothy McHugh<br>UGI Corporation<br>1 UGI Drive<br>Denver, PENNSYLVANIA 17517<br>UNITED STATES<br>MchughT@oneugi.com | Alexandra Colaizzi<br>UGI Utilities, Inc.<br>1 UGI Drive<br>Denver, PENNSYLVANIA 17517<br>acolaizzi@ugi.com |
| UGI Utilities Inc. | | Jessica Rogers<br>Director - Regulatory Strategy<br>UGI Utilities, Inc.<br>1 UGI Drive<br>DENVER, PENNSYLVANIA 17517<br>jrogers@ugi.com |
| UGI Utilities Inc. | | Jesse Tyahla<br>Director of Energy Supply & Pl<br>UGI Utilities Inc.<br>1 UGI Drive<br>Denver, PENNSYLVANIA 17517<br>jtyahla@ugi.com |
| UGI Utilities Inc. | | Jamie Jowers<br>Sr Supervisor Energy Supply an<br>UGI Utilities Inc.<br>1 UGI Drive<br>Denver, PENNSYLVANIA 17517<br>jharper@ugi.com |

Attachment A

186 FERC ¶ 61,163
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
Allison Clements and Mark C. Christie.

| | |
|---|---|
| Public Service Commission of West Virginia | Docket Nos.   EL23-45-000 |
| v. | |
| PJM Interconnection, L.L.C. | |
| | |
| Independent Market Monitor for PJM | EL23-50-000 |
| v. | |
| PJM Interconnection, L.L.C. | |

ORDER DENYING COMPLAINTS

(Issued March 1, 2024)

1.      On March 8, 2023, pursuant to sections 206 and 306 of the Federal Power Act (FPA),[1] and Rule 206 of the Commission's Rules of Practice and Procedure,[2] the West Virginia Public Service Commission (West Virginia Commission) filed a complaint alleging that PJM Interconnection, L.L.C. (PJM), by not allowing West Virginia Commission to attend PJM's Liaison Committee meetings, is violating its Operating Agreement, is violating Order No. 2000 and Order No. 719, and is discriminating unduly (West Virginia Commission Complaint).  On March 24, 2023, pursuant to Rule 206 of the Commission's Rules of Practice and Procedure,[3] Monitoring Analytics, LLC, acting in its capacity as the independent market monitor for PJM (Market Monitor), filed a complaint alleging that PJM, by not allowing the Market Monitor to attend PJM's Liaison Committee meetings, is violating Attachment M to the PJM Open Access Transmission Tariff (OATT) (Market Monitor Complaint).  In this order, we deny both complaints.

---

[1] 16 U.S.C. §§ 824e, 825e.

[2] 18 C.F.R. § 385.206 (2023).

[3] *Id.*

Docket Nos. EL23-45-000 and EL23-50-000                                    - 2 -

## I.  **Background**

### A.  **PJM's Liaison Committee**

2.      The Liaison Committee is governed by the Liaison Committee Charter, which was approved by the Members Committee and agreed to by the PJM Board.[4]  As set forth in that Charter, the Liaison Committee's purpose is to provide an avenue for communication between PJM Members,[5] through their elected sector representatives,[6] and the PJM Board.[7]  Specifically, the Liaison Committee Charter's purpose is to "ensure open exchanges and information sharing on topics of relevance to the Members and the Board of Managers to promote timely and adequate communications and informed decisions by the Board of Managers" and to allow PJM Members to understand the PJM Board's process and decision making.[8]  The Liaison Committee Charter restricts participation at Liaison Committee meetings to the PJM Board and Liaison Committee members, who consist of up to three sector representatives from each sector, the current Members Committee Chair, and current Members Committee Vice Chair.  Additionally, "all other [PJM] Members [may] attend as listen-only observers via conference call capability, and as in-person listen-only attendees."[9]

---

[4] PJM Liaison Committee Charter, at 1 (approved Feb. 21, 2019), https://www.pjm.com/-/media/committees-groups/committees/lc/postings/charter.ashx (Liaison Committee Charter).

[5] PJM's Operating Agreement defines "Member" as an entity that is "a Transmission Owner, a Generation Owner, an Other Supplier, an Electric Distributor, or an End Use Customer."  PJM, Intra-PJM Tariffs, 11.6, OA 11.6 Membership Requirements. (4.0.0), § 11.6.  All subsequent references to the Operating Agreement and OATT will omit the company name and the tariff title.

[6] PJM's Operating Agreement provides for five sectors:  Generation Owners, Other Supplies, Transmission Owners, Electric Distributors, and End-Use Customers. *See* 8.1, OA 8.1 Sectors. (1.0.0) § 8.1.1.

[7] Liaison Committee Charter at 1.

[8] *Id.*

[9] *Id.* at 2.

3.      Prior to September 2018, PJM did not enforce these attendance provisions.[10]
Instead, the Liaison Committee allowed stakeholders who did not meet the eligibility
criteria to attend Liaison Committee meetings.[11]  A request was made to enforce the
terms of the Liaison Committee Charter, however, and on September 27, 2018, the
Members Committee failed to adopt a motion to formally codify the practice of non-
enforcement through amendments to the Liaison Committee Charter.[12]  Accordingly, as
of the October 3, 2018 Liaison Committee meeting, PJM has been enforcing the Liaison
Committee Charter's attendance provisions.[13]  As relevant here, West Virginia
Commission and the Market Monitor have not been permitted to attend Liaison
Committee meetings since that time.

## B.      PJM's Operating Agreement

4.      Section 8.2.2, entitled "Regulatory Authorities," defines West Virginia
Commission's status within PJM.  Specifically, it provides that "each State electric
utility regulatory commission with regulatory jurisdiction within the PJM Region, may
nominate one representative to serve as an *ex officio* non-voting member on each of the
Standing Committees."[14]  Standing Committees, as defined by the Operating Agreement,
include "the Members Committee, the committees established and maintained under
Operating Agreement, section 8.6, and such other committees as the Members Committee
may establish and maintain from time to time."[15]  Section 8.6 provides that the "Members
Committee shall establish and maintain the Markets and Reliability Committee as a
Senior Standing Committee[,]" and that the "Members Committee also shall establish and
maintain the Market Implementation Committee, Planning Committee, Operating

---

[10] Letter from Michael R. Borgatti, PJM Members Committee Chair, to Any Ott,
President and CEO of PJM Interconnection, L.L.C., at 1 (Oct. 1, 2018), https://pjm.com/-
/media/committees-groups/committees/lc/postings/letter-regarding-enforcement-of-lc-
charter-attendance-provisions.ashx.

[11] *Id.*

[12] *Id.* at 2.

[13] *Id.*

[14] 8.2, OA 8.2 Representatives. (1.0.0), § 8.2.2.

[15] S–T, OA Definitions S – T (22.0.0).

Committee and Risk Management Committee (all under the Markets and Reliability Committee) as Standing Committees."[16]

## C.   Order No. 2000 and Order No. 719

5.      In Order No. 2000 and Order No. 719, the Commission set forth RTO/ISO governance principles and requirements that are relevant here.  First, in Order No. 2000, the Commission stated that an RTO/ISO must be independent of any market participant.[17] Accordingly, an RTO/ISO must in turn have "a decision making process that is independent of control by any market participant or class of participants."[18]  In 2002, the Commission found that PJM satisfied this requirement.[19]

6.      Second, in Order No. 719, the Commission, among other changes, amended its requirements established in Order No. 2000 related to RTO's responsiveness to customers and other stakeholders.  Specifically, the Commission stated that it would evaluate RTO responsiveness based on four criteria:

   a.     *Inclusiveness*, which is intended to ensure that existing or newly developed practices and other procedures are adequate to bring the views of all customers and other stakeholders before the Board.[20]

   b.     *Fairness in Balancing Diverse Interests*, which requires that each RTO or ISO ensures that its practices and procedures for decision making consider and balance the interests of its customers and stakeholders, and ensures that no single stakeholder group can dominate.[21]

---

[16] 8.6, OA 8.6 Senior, Standing, and Other Committees. (2.0.0), § 8.6.

[17] *Reg'l Transmission Orgs.*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 31,073 (1999), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000), *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).

[18] Order No. 2000, FERC Stats. & Regs. ¶ 31,089 at 31,046-47.

[19] *See PJM Interconnection, L.L.C.*, 101 FERC ¶ 61,345 (2002).

[20] *Wholesale Competition in Regions with Organized Mkts.*, Order No. 719, 125 FERC ¶ 61,071, at P 506 (2008).

[21] *Id.* P 507.

    c.   *Representation of Minority Interests to the RTO and ISO Boards*, which is intended to ensure that the minority views of customers and stakeholders are forwarded, at the same time as the majority views, to the boards during the deliberation process.[22]

    d.   *Ongoing Responsiveness*, which requires that RTOs and ISOs continue over time to consider customer and other stakeholder needs as the architecture or market environment of the RTO or ISO changes.[23]

### D.   <u>Attachment M to the PJM OATT</u>

7.     Attachment M to the PJM OATT sets forth the PJM Market Monitoring Plan. As relevant here, section IV.G of Attachment M states that the Market Monitor "may, as it deems appropriate or necessary to perform its functions under this Plan, participate (consistent with the rules applicable to all PJM stakeholders) in stakeholder working groups, committees or other PJM stakeholder processes."[24] Under Attachment M, the Market Monitor's role is to "objectively monitor the competitiveness of PJM Markets,[25] investigate violations of FERC[26] or PJM Market Rules,[27] recommend changes to PJM

---

    [22] *Id.* P 508.

    [23] *Id.* P 509. *See* also PJM Compliance Filing, Docket No. ER09-1063-000, at 51-57 (filed Apr. 29, 2009).

    [24] *See* ATTACHMENT M, OATT ATTACHMENT M (5.0.0), § IV.G.

    [25] O-P-Q, OATT Definitions, OATT (27.2.0), § I.1 (PJM Markets "shall mean the PJM Interchange Energy Market, capacity markets, including the RPM auctions, and any other market operated by PJM, together with all bilateral or other wholesale electric power and energy transactions, capacity transactions, ancillary services transactions (including black start service), transmission transactions, Financial Transmission Rights transactions, or transactions in any other market operated under the Agreements within the PJM Region, wherein Market Participants may incur Obligations to PJM and/or PJMSettlement.").

    [26] E-F, OATT Definitions (32.2.0), § I.1 (FERC Market Rules "mean the market behavior rules and the prohibition against electric energy market manipulation codified by the Commission in its Rules and Regulations at 18 CFR §§ 1c.2 and 35.37, respectively; the Commission-approved PJM Market Rules and any related proscriptions or any successor rules that the Commission from time to time may issue, approve or otherwise establish.").

    [27] O-P-Q, OATT Definitions, OATT (27.2.0), § I.1 (PJM Market Rules "shall mean the rules, standards, procedures, and practices of the PJM Markets set forth in the

Document Accession #: 20240301-3057     Filed Date: 03/01/2024

Market Rules, prepare reports for the Authorized Government Agencies[28] and take such other actions as are specified in this Plan."[29]  Specifically, the monitored activities include:  1) compliance with the PJM Market Rules, 2) actual or potential design flaws in the PJM Market Rules, 3) structural problems in the PJM Markets that may inhibit a robust and competitive market, 4) potential to exercise market power or violate PJM or FERC Market Rules, 5) PJM's implementation of the PJM Market Rules or operation of the PJM Markets, 6) and such matters necessary to prepare reports.[30]

## II.   **Complaints**

### A.   **West Virginia Commission's Complaint**

8.      West Virginia Commission argues that PJM is violating its Operating Agreement by not allowing West Virginia Commission to attend Liaison Committee meetings.  West Virginia Commission states that, per section 8.2.2 of the Operating Agreement, state regulatory commissions can become *ex officio* PJM members, and *ex officio* members have the right to attend and participate in all PJM Standing Committee meetings.[31] According to West Virginia Commission, the Liaison Committee is a Standing Committee under the Operating Agreement.  West Virginia Commission notes that the Operating Agreement defines Standing Committees as "the Members Committee, the committees established and maintained under Operating Agreement, section 8.6, and such other committees as the Members Committee may establish and maintain from time

---

PJM Tariff, the PJM Operating Agreement, the PJM Reliability Assurance Agreement, the PJM Consolidated Transmission Owners Agreement, the PJM Manuals, the PJM Regional Practices Document, the PJM-Midwest Independent Transmission System Operator Joint Operating Agreement or any other document setting forth market rules.").

[28] A-B, OATT Definitions, OATT (18.2.0), § I.1 (Authorized Government Agencies "means a regulatory body or government agency, with jurisdiction over PJM, the PJM Market, or any entity doing business in the PJM Market, including, but not limited to, the Commission, State Commissions, and state and federal attorneys general.").

[29] *See* ATTACHMENT M, OATT ATTACHMENT M (5.0.0), § IV.A.

[30] *See id.* § IV.B.

[31] West Virginia Commission Complaint at 13.

to time."[32]  West Virginia Commission also notes that section 8.6 of the Operating Agreement allows "the Members Committee . . . to establish and dissolve other Standing Committees from time to time."[33]

9.    According to West Virginia Commission, both the Commission and PJM have recognized that the Liaison Committee is a Standing Committee.  West Virginia Commission states that the Commission, in its Order on PJM's Order No. 719 compliance filing, "stated . . . '*PJM's Liaison Committee, for example, is a standing stakeholder advisory committee to the Board.*'"[34]  West Virginia Commission also states that PJM, in testimony by one of its executive officers submitted in PJM's Order No. 719 technical conference proceeding, "stated that 'the Liaison Committee meetings should also be considered open meetings as well because while only members of the committee may attend the meetings in person, all stakeholders can listen to the proceedings of the Liaison Committee by teleconference.'"[35]

10.    West Virginia Commission also argues that PJM treats the Liaison Committee as a Standing Committee.  According to West Virginia Commission, section 8.6.3 of the Operating Agreement requires any committees that are not Standing Committees to be reauthorized every two years by the members.[36]  West Virginia Commission argues that PJM has not cited a single instance in which the members have reauthorized the Liaison Committee as required by section 8.6.3.  Thus, the only way that the Liaison Committee can continue to exist is if PJM considers it to be a Standing Committee.  By insisting that the Liaison Committee is not a Standing Committee, West Virginia Commission argues that PJM is directly contradicting the Operating Agreement.[37]

---

[32] *Id.* at 9 (citing S–T, OA Definitions S – T (22.0.0)).

[33] *Id.* (citing 8.6, OA 8.6 Senior, Standing, and Other Committees. (2.0.0), § 8.6).

[34] *Id.* at 14 (citing *PJM Interconnection, L.L.C.*, 133 FERC ¶ 61,071, at P 57 (2010) (Order No. 719 Compliance Order) (emphasis in original)).

[35] *Id.* (citing PJM Interconnection, L.L.C., Comments of PJM Interconnection, L.L.C. to Support the Participation of Andrew L. Ott and Vincent P. Duane in the Panel Discussion, Docket Nos. ER09-1048-000, ER09-1049-000, ER09-1050-000, ER09-1192-000, ER09-1051-000, ER09-1063-000, ER09-1142-000, at 12 (Feb. 4, 2010) (PJM's Order No. 719 Technical Conference Comments)).

[36] *Id.* at 15

[37] *Id.*

11.    West Virginia Commission contends that the clear intent behind giving state commissions *ex officio* member status is to comply with the openness and responsiveness requirements of Order No. 2000 and Order No. 719.[38]  According to West Virginia Commission, the Commission in Order No. 2000 determined that RTO governing boards must ensure "that their decisionmaking [sic] process [is] independent of any market participant or any class of participants."[39]  West Virginia Commission argues that state commissions can only verify PJM's compliance with this principle if state commissions are able to attend or observe Liaison Committee meetings.  This is because, West Virginia Commission contends, the Liaison Committee is "one of the most important stakeholder meetings in PJM . . . where members of the Board interact directly with PJM members."[40]  West Virginia Commission asserts that West Virginia Commission became an *ex officio* member for the express purpose of attending Liaison Committee meetings.[41]

12.    West Virginia Commission argues that to carry out its responsibilities, it must attend Liaison Committee meetings.  For example, to fulfill its statutory responsibility to ensure affordable rates and reliable electric service in West Virginia, West Virginia Commission argues that it must be able to observe interactions between West Virginia-jurisdictional utilities and the PJM Board.[42]  West Virginia Commission states that it has not been able to find any summaries of Board meetings with the Liaison Committee on either the Board Communications website or the PJM Liaison Committee website, as the Liaison Committee website posts only the meeting agendas, and not summaries.[43]  West Virginia Commission argues that the Commission has recognized the important role that state commissions play in the RTO governance process.  West Virginia Commission cites Order No. 2000, which states that "[i]t was thought that state officials would be better informed in making their own decisions if they could closely observe the considerations and constraints that were weighed by the RTO in making its decisions."[44]  West Virginia

---

[38] *Id.* at 17.

[39] *Id.* (citing Order No. 2000, FERC Stats. & Regs. ¶ 31,089 at ¶ 31,073).

[40] *Id.*

[41] *Id.*

[42] *Id.* at 19.

[43] *Id.* at 20-22.

[44] *Id.* at 23 (citing Order No. 2000, FERC Stats. & Regs. ¶ 31,089 at ¶ 31,074-75).

Commission argues that, unless it is allowed to attend Liaison Committee meetings, it will not have sufficient transparency into PJM's decision making process.[45]

13.    West Virginia Commission argues that the PJM Manuals require an open forum for Liaison Committee meetings.  West Virginia Commission states that PJM Manual 34 recognizes the fundamental transparency objective in PJM Board and stakeholder communications, and that section 15.1 "identifies the Liaison Committee as one of the critical mechanisms for ensuring transparency."[46]  West Virginia Commission avers that the PJM Liaison Committee Charter arguably provides for West Virginia Commission's attendance at Liaison Committee meetings.  That Charter, West Virginia Commission notes, states that attendance at Liaison Committee meetings is "*open to all other Members* to attend as listen-only observers via conference call capability, and as listen-only attendees," and the West Virginia Commission is an *ex officio* member of PJM.[47]

14.    West Virginia Commission argues that PJM's deference to its Members on whether West Virginia Commission is allowed to attend Liaison Committee meetings as opposed to complying with the PJM OATT and Operating Agreement is unjust and unreasonable.  West Virginia Commission alleges that PJM "simply bowed to the will of certain sector members who are not interested in transparency and open participation[,]" which does not comport with PJM's obligation under its Operating Agreement, Manual, or Order No. 2000's and Order No. 719's requirements for open, transparent and independent governance.[48]

15.    West Virginia Commission explains that, on February 14, 2022, it contacted the Commission's Enforcement Hotline regarding being excluded from Liaison Committee meetings.  West Virginia Commission argues that PJM's response to West Virginia Commission's Enforcement Hotline report, which PJM submitted to the Commission on March 15, 2022, does not support PJM's decision to exclude West Virginia Commission from Liaison Committee meetings.  According to West Virginia Commission, PJM responded to that report by saying that the Commission previously upheld PJM's decision to not allow state regulatory commissions to attend Liaison Committee meetings when the Commission denied the Illinois Commerce Commission's request for a state

---

[45] *Id.* at 23-24.

[46] *Id.* at 24-25 (citing PJM Manual 34 at 92 (Section 15.2)).

[47] *Id.* at 25-26 (citing Liaison Committee Charter at 2).

[48] *Id.* at 26-27.

regulatory commission representative to be placed on the Liaison Committee.[49] That argument, West Virginia Commission states, is not relevant here because West Virginia Commission is not asking for a seat on the Liaison Committee. Rather West Virginia Commission requests only the right to observe and attend Liaison Committee meetings.[50]

16.     West Virginia Commission alleges that PJM's decision to not allow West Virginia Commission to attend Liaison Committee meetings while allowing certain other *ex officio* members to attend violates the prohibition against undue discrimination in FPA sections 205 and 206.[51] By allowing state consumer advocates to observe and attend Liaison Committee meetings, while not allowing the same for state commissions, West Virginia Commission argues that PJM is treating like *ex officio* members differently.[52] West Virginia Commission states that the only difference between these two types of *ex officio* members is that state consumer advocates have voting rights, whereas state commissions do not. That distinction, according to West Virginia Commission, is irrelevant because the Liaison Committee does not vote or make decisions.[53] According to West Virginia Commission, there is no language elsewhere in the Operating Agreement or PJM Manuals that distinguishes between state regulatory *ex officio* members and other *ex officio* members with respect to the right to observe, attend, or participate in Standing Committee meetings.[54]

17.     West Virginia Commission alleges that PJM's not allowing West Virginia Commission to attend Liaison Committee meetings violates the open access and transparency requirements of Order No. 2000 and Order No. 719.[55] West Virginia Commission states that Order No. 2000 requires an RTO to maintain independence from market participants, and that Order No. 719 requires an RTO to maintain transparency in its operations, particularly in meetings between the RTO's Board and its stakeholders. Moreover, West Virginia Commission argues that the Commission noted in Order No. 2000 that state commissions have a key role in RTO formation and development. And in Order No. 719, West Virginia Commission states that the Commission discussed the

---

[49] *Id.* at 27.

[50] *Id.*

[51] *Id.* at 29.

[52] *Id.* at 30-31.

[53] *Id.* at 32.

[54] *Id.* at 18-19.

[55] *Id.* at 32-33.

importance of openness, inclusivity, transparency, and responsiveness to stakeholders in an RTO's decision-making process and governance.[56]  West Virginia Commission argues that PJM's decision to exclude West Virginia Commission from Liaison Committee meetings violates these fundamental principles and endangers state regulatory commissions' ability to verify the PJM Board's independence.[57]

## B.    **Market Monitor's Complaint**

18.    The Market Monitor states that PJM's decision to not allow the Market Monitor to attend Liaison Committee meetings violates Attachment M to the PJM OATT.  The Market Monitor argues that Attachment M's scope is broad, noting that it allows the Market Monitor to attend stakeholder working groups, committees, or other PJM stakeholder processes.[58]  The Market Monitor also argues that it determines for itself whether participation in these meetings is appropriate or necessary to perform its functions.[59]  Thus, the Market Monitor argues that the Liaison Committee is a stakeholder committee under Attachment M to the PJM OATT that the Market Monitor can register for and participate in if the Market Monitor deems it appropriate or necessary to perform its functions.[60]

19.    The Market Monitor explains that prior to 2018, the Market Monitor attended Liaison Committee meetings.  But, according to the Market Monitor, on September 27, 2018, the Members Committee voted to exclude the Market Monitor, state commission representatives, Commission staff, and others from Liaison Committee meetings.[61]  The Market Monitor argues that neither the Members Committee nor PJM has the authority to enforce a committee charter that violates PJM's OATT.[62]  The Market Monitor avers that

---

[56] *Id.* at 33-35 (citing Order No. 719, 125 FERC ¶ 61,071 at PP 503, 537).

[57] *Id.* at 35-36.

[58] Market Monitor Complaint at 1-2.

[59] *Id.*

[60] *Id.*

[61] *Id.* at 2-3.

[62] *Id.* at 3.

excluding the Market Monitor from Liaison Committee meetings is inconsistent with PJM's, the PJM Board's, and the Market Monitor's independence.[63]

## III.     Notice and Responsive Pleadings

### A.     West Virginia Commission's Complaint

20.     Notice of West Virginia Commission's complaint was published in the *Federal Register*, 88 Fed. Reg. 16,429 (Mar. 17, 2023), with answers, interventions, and protests due on or before March 28, 2023.  American Electric Power Service Corporation (AEPSC), Public Citizen, Inc. (Public Citizen), Calpine Corporation (Calpine), the Market Monitor, Old Dominion Electric Cooperative (ODEC), Dayton Power and Light Company d/b/a AES Ohio (AES Ohio), the PSEG Companies,[64] Dominion Energy Services, Inc. (Dominion), PJM Power Providers Group (P3), Northern Virginia Electric Cooperative, Inc. (NOVEC), Duquesne Light Company (Duquesne Light), NRG Power Marketing LLC (NRG-PML), Direct Energy Business Marketing LLC (DEBM), Midwest Generation, LLC (MWGen), PJM Industrial Customer Coalition (Industrial Customer Coalition), Electric Power Supply Association (EPSA), PPL Electric Utilities Corporation (PPL Electric), Enel North America, Inc., Southern Maryland Electric Cooperative, Inc. (SMECO), Constellation Energy Generation, LLC (Constellation), Exelon Corporation (Exelon), American Municipal Power, Inc. (AMP), and the Maryland Office of People's Counsel (Maryland OPC) each filed timely motions to intervene.  The Organization of PJM States, Inc. (OPSI) and Maryland Public Service Commission (Maryland PSC) each filed a Notice of Intervention.  The American Clean Power Association (ACP), LS Power Development, LLC (LSP Development), and Solar Energy Industries Association (SEIA) each filed out-of-time motions to intervene.

21.     PJM filed an answer to West Virginia Commission's Complaint (PJM Answer to West Virginia Commission).  Public Citizen, OPSI, P3, the Market Monitor, Industrial Customer Coalition, and Indicated Transmission Owners[65] each filed comments.  PJM filed reply comments to the comments filed by Public Citizen.  West Virginia Commission

---

[63] *Id.*

[64] The PSEG Companies are Public Service Electric and Gas Company, PSEG Power LLC, and PSEG Energy Resources & Trade LLC.

[65] The Indicated Transmission Owners include the Dayton Power and Light Company d/b/a AES Ohio, Dominion Energy Services, Inc. on behalf of Virginia Electric and Power Company d/b/a Dominion Energy Virginia, Duquesne Light Company, Exelon Corporation, on behalf of its affiliates Atlantic City Electric Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, Delmarva Power & Light Company, PECO Electric Company, and Potomac Electric Power Company.

filed a motion for leave to answer and answer to PJM's answer.  Public Citizen filed a motion for leave to answer and answer to PJM's reply comments.

22.    West Virginia Commission filed a motion to lodge certain stakeholder material, and then filed a notice of withdrawal of its motion to lodge.

### 1.    PJM's Answer to West Virginia Commission's Complaint

23.    PJM argues that the Liaison Committee is not a Standing Committee.  According to PJM, the Operating Agreement limits Standing Committees to "the Members Committee, the committees established and maintained under Operating Agreement, section 8.6, and such other committees as the Members Committee may establish from time to time."[66]  PJM notes that the Liaison Committee is not among the committees listed in section 8.6 of the Operating Agreement.  PJM explains that, while the Members Committee has established other Standing Committees not listed in section 8.6, those other committees' charters expressly stated that they were Standing Committees, whereas the Liaison Committee Charter does not include such a statement.[67]  Rather, PJM states that the Liaison Committee is a "joint effort *outside of the Standing Committees* whose purpose is to facilitate information sharing between *Members* and the [PJM] Board."[68]  Therefore, because the Liaison Committee is not a Standing Committee, West Virginia Commission as an *ex officio*, non-voting member has no status in or access to the Liaison Committee.[69]

24.    PJM contests West Virginia Commission's argument that PJM has treated the Liaison Committee as a Standing Committee because the Liaison Committee has never been reauthorized by a Standing Committee.[70]  PJM states that the Liaison Committee is not governed solely by the Members.  Rather, it is a committee jointly subject to oversight by the Members Committee and the PJM Board.[71]  Moreover, PJM explains that the Liaison Committee Charter provides that one year after the Liaison Committee's implementation, the Members Committee and the PJM Board "shall assess the efficacy of

---

[66] PJM Answer to West Virginia Commission Complaint at 6 (citing S–T, OA Definitions S – T (22.0.0)).

[67] *Id.* at 6-7.

[68] *Id.* at 7 (emphasis in original).

[69] *Id.*

[70] *Id.* at 8.

[71] *Id.*

the Liaison Committee process in meeting its mission and shall take appropriate action."[72]  According to PJM, the action taken was to continue the Liaison Committee in accordance with its mission.[73]

25.     PJM argues that the Commission has previously upheld PJM's rules regarding state commissions' participation in Liaison Committee meetings.  According to PJM, West Virginia Commission relies on dicta in a prior Commission order and on statements of other PJM personnel that West Virginia Commission has taken out of context.[74]  Specifically, PJM argues that the Commission's 2010 characterization of the Liaison Committee in *PJM Interconnection, L.L.C.* as a "standing stakeholder advisory committee" does not support West Virginia Commission's argument that the Liaison Committee is a Standing Committee.[75]  PJM argues that it did not refer to the Liaison Committee in that proceeding, and that the Commission made no specific findings as to the Liaison Committee's status.  Instead, according to PJM, the Commission referred to the Liaison Committee as one of "several 'existing governance procedures and stakeholder processes.'"[76]  Thus, PJM argues, in this context, "standing" refers to the evergreen nature of the Liaison Committee and not to any specific requirements for participation outlined in the Operating Agreement.[77]

26.     PJM argues that the Commission's Order No. 719 Compliance Order is precedent that actually supports limiting state commissions' attendance at Liaison Committee meetings.  PJM notes that in that case the Commission declined the Illinois Commerce Commission's request to require a state commission representative on the Liaison Committee, finding that "PJM's procedures allow stakeholders access to the [PJM] Board members at the general session meetings."[78]  PJM explains that the Commission also held that "it is sufficient that the state commissions are permitted to nominate one representative to serve as *ex officio* non-voting members on each of the Standing

---

[72] *Id.* (citing Liaison Committee Charter at 3).

[73] *Id.*

[74] *Id.* at 8-9.

[75] *Id.* at 9 (citing Order No. 719 Compliance Order, 133 FERC ¶ 61,071 at P 57).

[76] *Id.* (citing *PJM Interconnection, L.L.C.*, 133 FERC ¶ 61,071 at P 41).

[77] *Id.*

[78] *Id.* at 10 (citing Order No. 719 Compliance Order, 133 FERC ¶ 61,071 at P 51).

Committees."[79]  PJM also notes that the Commission explained that state commissions are part of OPSI, which has representatives who regularly attend PJM stakeholder meetings.[80]

27.     PJM argues that the distinction between state commission participation and state consumer advocate participation is proper.  PJM argues that West Virginia Commission, in alleging that PJM is violating FPA section 205's and section 206's prohibition against undue discrimination, ignores the distinct rights and obligations provided to state consumer advocates under the Operating Agreement.[81]  Specifically, PJM explains that per section 8.2.3 of the Operating Agreement, state consumer advocates have unique voting rights in the End-Use Customer sector, and that section 8.2.2, which governs state commissions, does not provide voting rights.[82]  With respect to the Liaison Committee, PJM explains that Manual 34, section 15.2.1, states that the Liaison Committee Charter includes the process for determining Liaison Committee membership, and that membership per the Charter "will consist of up to 3 representatives from each sector, plus the current Members Committee Chair and Vice-Chair."[83]  Accordingly, PJM argues, state consumer advocates are permitted to attend Liaison Committee meetings because they have voting rights in the End-Use Customer sector, which state commissions do not.[84]

## 2.     Comments, Protests, and Other Answers

### a.     Comments in Support

28.     OPSI, Public Citizen, Industrial Customer Coalition, and the Market Monitor support granting West Virginia Commission's Complaint.

29.     The Market Monitor argues that PJM is violating its Operating Agreement by not allowing West Virginia Commission to attend Liaison Committee meetings.  The Market Monitor contends that, per sections 1 and 8.6 of the Operating Agreement, and in accordance with the plain meaning of the term, the Liaison Committee is a Standing

---

[79] *Id.*

[80] *Id.*

[81] *Id.* at 11.

[82] *Id.*

[83] *Id.* at 12-13 (citing Liaison Committee Charter at 2).

[84] *Id.* at 13-14.

Docket Nos. EL23-45-000 and EL23-50-000                                    - 16 -

Committee.[85]  Because the Liaison Committee is a Standing Committee, the Market Monitor argues that West Virginia Commission must be allowed to attend its meetings under the Operating Agreement.[86]

30.     OPSI notes that PJM has described the Liaison Committee "as 'the primary advisory committee to the PJM Board,'" and that the Commission has described the Liaison Committee "as 'a standing stakeholder advisory Committee.'"[87]  Public Citizen requests that the Commission institute a Notice of Inquiry to pursue governance reforms consistent with Order No. 719, because even if the Commission grants West Virginia Commission's complaint, similarly situated, non-PJM members, like Public Citizen, will still be denied access to PJM's Liaison Committee.[88]  Such an inquiry, according to Public Citizen, is necessary to ensure RTO responsiveness.  As support for that need for reform, Public Citizen cites to a dissent to a recent Commission order, academic research, and pending state legislation in Maryland.[89]

31.     OPSI and the Industrial Customer Coalition argue that attending Liaison Committee meetings would enhance state commissions' ability to fulfill their obligations.[90]  Industrial Customer Coalition asserts that the issues discussed at Liaison Committee meetings are "inextricably intertwined" with state commissions' obligations to ensure just and reasonable and not unduly discriminatory rates.[91]  OPSI avers that when it is denied access to Liaison Committee meetings, OPSI and its members cannot collect information, monitor markets and events, and consider proposals related to PJM's

---

[85] Market Monitor Comments on West Virginia Commission Complaint at 2-3.

[86] *Id.* at 3.

[87] *Id.* (citing PJM's Order No. 719 Technical Conference Comments at 5).

[88] Public Citizen March Comments on West Virginia Commission Complaint at 1-2.

[89] *Id.* at 2-3.

[90] OPSI Comments on West Virginia Complaint at 2; Industrial Customer Coalition Comments on West Virginia Commission Complaint at 2-3.

[91] Industrial Customer Coalition Comments on West Virginia Commission Complaint at 2.

operations and functions."[92]  If retail regulators cannot attend Liaison Committee meetings, OPSI argues that those retail regulators will have limited insight into these discussions.[93]

### b.     Protests and Comments in Opposition

32.     Indicated Transmission Owners and P3 oppose granting West Virginia Commission's Complaint.

33.     P3 argues that PJM's not permitting West Virginia Commission to attend Liaison Committee meetings does not violate the PJM OATT, Operating Agreement, or Manual. P3 argues that there is nothing in the PJM OATT, Operating Agreement, or Manual that supports West Virginia Commission's argument that the Liaison Committee is a Standing Committee.  P3 asserts that West Virginia Commission's argument that PJM's website implies that the Liaison Committee is a Standing Committee is untrue.[94]  Indicated Transmission Owners argue that granting the complaint would create undue discrimination, because it would require PJM to treat unlike committees, i.e., the Liaison Committee and Standing Committees, alike.  This would, Indicated Transmission Owners assert, discriminate against entities who abide by PJM's committee participation eligibility rules.[95]

34.     P3 argues that PJM is not discriminating unduly by not allowing West Virginia Commission to attend Liaison Committee meetings.  P3 notes that *ex officio* state consumer advocates are allowed to attend Liaison Committee meetings because state consumer advocates have voting rights in the End-Use Customer sector, whereas state commissions, as non-voting *ex officio* members, do not.  Thus, according to P3, these two types of *ex officio* members are not similarly situated.[96]

35.     P3 and Indicated Transmission Owners assert that the Liaison Committee allows PJM Members and PJM management to have candid, non-public dialogue.[97]  If non-PJM Members, including state regulators, are allowed to observe Liaison Committee meetings,

---

[92] OPSI Comments on West Virginia Commission Complaint at 4.

[93] *Id.*

[94] P3 Protest of West Virginia Commission Complaint at 5-7.

[95] *Id.*

[96] *Id.* at 8.

[97] P3 Protest of West Virginia Commission Complaint at 10-11; Indicated Transmission Owners Protest of West Virginia Commission Complaint at 4.

P3 argues that open communication and information-sharing will be undermined.[98] Moreover, Indicated Transmission Owners argue that there is no decision making authority vested in the Liaison Committee, and individual member lobbying is forbidden under the Liaison Committee Charter. P3 notes that with respect to transparency, Liaison Committee meeting agendas are publicly posted, whereas the agendas for the PJM Board's meetings with OPSI are not.[99]

36. P3 and Indicated Transmission Owners argue that PJM still satisfies its Order No. 719 obligations even though West Virginia Commission is not allowed to attend Liaison Committee meetings. P3 notes that, in Order No. 719, the Commission did not require the PJM Board to place a state commission representative on the Liaison Committee as the Illinois Commerce Commission had requested.[100] P3 and Indicated Transmission Owners assert that OPSI has its own private meetings with the PJM Board three times per year, which serve a similar function to the Liaison Committee.[101] Thus, according to P3, state commissions, like West Virginia Commission, continue to have meaningful access to the PJM Board as required by Order No. 719.[102]

37. Indicated Transmission Owners argue that West Virginia Commission has not satisfied its FPA section 206 burden because West Virginia Commission has not provided sufficient evidence of harm or error.[103] Indicated Transmission Owners also argue that West Virginia Commission's claim that it needs to observe Liaison Committee meetings to satisfy its state statutory responsibilities is baseless because only sector interests, not

---

[98] Indicated Transmission Owners Protest of West Virginia Commission Complaint at 11.

[99] *Id.* at 11-12.

[100] P3 Protest of West Virginia Commission Complaint at 8-9 (citing Order No. 719 Compliance Order, 133 FERC ¶ 61,071 at P 55).

[101] Indicated Transmission Owners Protest of West Virginia Commission Complaint at 4-5.

[102] P3 Protest of West Virginia Commission Complaint at 9-10 (citing Memorandum of Understanding between PJM Interconnection, L.L.C. and the Organization of PJM States, Inc., at P 2 (June 5, 2005) https://opsi.us/wp-content/uploads/2020/02/OPSI_PJM_MOU_executed_June_8_2005-1-1.pdf (OPSI MOU)).

[103] Indicated Transmission Owners Protest of West Virginia Commission Complaint at 5-6.

company-specific interests, are discussed during Liaison Committee meetings.[104]  Finally, Indicated Transmission Owners argue that Commission precedent requires the Commission to reject West Virginia Commission's complaint.  As support, Indicated Transmission Owners cite to past instances in which the Commission declined to impose changes to RTO governance procedures.[105]

### c.    West Virginia's Answer to PJM's Answer and Reply Comments

38.    West Virginia Commission rebuts PJM, P3, and Indicated Transmission Owners by arguing that the Liaison Committee is a Standing Committee because all non-standing committees, per section 8.6.3 of the Operating Agreement, must be "automatically 'terminated upon completion of [their] assigned tasks, and, if not terminated, shall terminate two years after formation unless reauthorized by the Standing Committee that directed its formation.'"[106]  West Virginia Commission notes that the Liaison Committee has never been reauthorized, and thus it cannot be a non-standing committee.  West Virginia Commission also argues that PJM, P3, and Indicated Transmission Owners ignore the fact that, according to West Virginia Commission, PJM has itself described the Liaison Committee as a Standing Committee.[107]

39.    West Virginia Commission argues that the differences cited by PJM, P3, and Indicated Transmission Owners between *ex officio* state commissions and *ex officio* state consumer advocates are not meaningful.  Specifically, West Virginia Commission argues that voting rights in the End-Use Customer sector, which is the distinction that P3 cites, are not relevant to Liaison Committee meetings where no votes are taken.[108]  West Virginia Commission maintains that not allowing state commissions to attend Liaison

---

[104] *Id.* at 6-7.

[105] *Id.* at 7 (citing *RTO Insider LLC v. New England Power Pool Participants Comm.*, 166 FERC ¶ 61,062, at P 48 (2019), *reh'g denied*, 170 FERC ¶ 61,034 (2002) (*RTO Insider*); *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 403 (2004) (*CAISO v. FERC*)).

[106] West Virginia Commission April Answer at 3.

[107] *Id.* at 3-5.

[108] *Id.* at 5.

Committee meetings while allowing state consumer advocates to attend is unduly discriminatory.[109]

40.     West Virginia Commission argues that PJM should not be reluctant to interfere with the internal operations of its committees, and that the Liaison Committee is the exact type of "quasi-regulatory" PJM operation that the Commission must oversee.[110] West Virginia Commission argues that PJM's allowing closed conversations between PJM Members and the PJM Board violates the independence and transparency principles underlying RTO governance.  West Virginia Commission states that PJM should not defer to PJM Members on who can attend Liaison Committee meetings if PJM Members' proposals contradict PJM's OATT or the Commission's rules on RTO governance.[111]

41.     In response to PJM's, P3's, and Indicated Transmission Owner's assertions that West Virginia Commission also has meaningful access to the PJM Board through OPSI, West Virginia Commission argues that the Liaison Committee meetings "are closed meetings in addition to the closed meetings the PJM Board holds with each of the five stakeholder sectors in PJM."[112]  According to West Virginia Commission, a second forum for "private stakeholder conversations" is unnecessary.[113]

42.     Finally, West Virginia Commission argues that the cases cited by PJM, P3, and Indicated Transmission Owners on the Commission's authority over internal RTO governance are inapposite.  West Virginia Commission distinguishes *RTO Insider* by arguing that it did not involve a Commission-regulated RTO barring stakeholders from accessing meetings with an RTO's Board.[114]  West Virginia Commission distinguishes *CAISO v. FERC* by arguing that access to Liaison Committee meetings is much more directly related to rate structure than is a Board member nomination process, the issue in

---

[109] *Id.* at 6-7.

[110] *Id.* at 9.

[111] *Id.* at 10.

[112] *Id.* at 11.

[113] *Id.*

[114] *Id.* at 13-14 (citing *RTO Insider*, 167 FERC ¶ 61,021 at P 48).

*CAISO v. FERC*.[115]  West Virginia Commission also argues that PJM's reliance on the Commission's Order No. 719 Compliance Order is misplaced.[116]  West Virginia Commission states that unlike the Illinois Commerce Commission, West Virginia Commission is not seeking a seat on the Liaison Committee, rather it only seeks to observe Liaison Committee meetings.[117]

43.     PJM argues that Public Citizen's claims about its membership status and West Virginia Commission's membership status are beyond the scope of this proceeding.[118]  PJM notes that the Commission has previously rejected similar claims made by Public Citizen in other proceedings.[119]  Moreover, PJM notes that PJM meetings are open to all interested parties and that Public Citizen has previously presented proposals at PJM meetings.[120]  According to PJM, providing voting rights to any non-governmental organization throughout PJM's region would create inefficient and unmanageable voting on proposals that affect market participants in PJM, and would contradict the Operating Agreement.[121]

44.     PJM argues that Public Citizen's call for a Notice of Inquiry on Order No. 719's governance and transparency requirements is without merit and is a collateral attack on prior Commission orders.  PJM notes that the Commission has also previously rejected these claims made by Public Citizen in other proceedings.[122]

45.     Replying to PJM, Public Citizen notes that the Public Interest and Environmental Organizations User Group's once-a-year meeting with the PJM Board is open to the

---

[115] *Id.* at 15 (citing *CAISO v. FERC*, 372 F.3d at 403).

[116] *Id.* 15-16.

[117] *Id.*

[118] PJM Comments Replying to Public Citizen Comments on West Virginia Commission Complaint at 2.

[119] *Id.* at 2-3.

[120] *Id.* at 3.

[121] *Id.* at 4.

[122] *Id.* at 4-6.

public, while Liaison Committee meetings are not. According to Public Citizen, PJM has given no explanation for this inconsistent treatment.[123]

### B. Market Monitor's Complaint

46. Notice of the Market Monitor's complaint was published in the *Federal Register*, 88 Fed. Reg. 19,298 (Mar. 31, 2023), with answers, interventions, and protests due on or before April 17, 2023. Exelon, Public Citizen, SEIA, P3, PSEG Companies, Calpine, Dominion, AES Ohio, Duquesne Light, LSP Development, EPSA, AEPSC, PPL Electric, American Council on Renewable Energy (ACORE), West Virginia Commission, ODEC, Enel North America, Inc., Constellation, The Office of the Ohio Consumers' Counsel, Advanced Energy United, ACP, National Hydropower Association (NHA), Nuclear Energy Institute (NEI), Energy Trading Institute (ETI), NOVEC, AMP, New Jersey Division of Rate Counsel (NJ Rate Counsel), Delaware Division of the Public Advocate, SMECO, Maryland OPC, and UGI Utilities, Inc. (UGI) each filed timely motions to intervene. OPSI filed a notice of intervention.

47. PJM filed an answer to the complaint. Public Citizen, OPSI, Dominion, Ohio Consumers' Counsel, NJ Rate Counsel, Maryland OPC, and the Delaware Division of the Public Advocate each filed timely comments. Advanced Energy United, ACP, ACORE, EPSA, NHA, NEI, P3 and SEIA collectively filed a protest. PJM filed reply comments to the comments of Public Citizen. West Virginia Commission filed a motion for leave to comment out of time and comments. Exelon filed a motion for leave to answer and answer to Public Citizen's comments. Public citizen filed a motion for leave to answer and answer to Exelon. The Market Monitor filed a motion for leave to answer and answer to PJM.

### 1. PJM's Answer to the Market Monitor's Complaint

48. PJM argues that the Market Monitor has failed to satisfy its burden under FPA section 206.[124] PJM argues that attendance at Liaison Committee meetings is not necessary for the Market Monitor to perform its functions under Attachment M to the PJM OATT. Moreover, PJM argues that the Market Monitor already has direct and indirect access to the PJM Board.[125]

---

[123] Public Citizen April Answer to PJM Answer to West Virginia Commission Complaint at 2.

[124] PJM Answer to Market Monitor Complaint at 4, 8.

[125] *Id.* at 8.

49.     PJM argues that the Liaison Committee is not a stakeholder working group as that term is used in Attachment M to the PJM OATT.[126]  Instead, PJM notes that the Liaison Committee is a standalone, joint effort between the PJM Members and the PJM Board to facilitate information sharing.  As such, PJM argues that the Liaison Committee's activities do not implicate the Market Monitor's functions under Attachment M.[127]

50.     PJM notes that the Market Monitor does not explain why it needs access to Liaison Committee meetings.[128]  Moreover, PJM argues that assuming what the Market Monitor wants is access to the PJM Board, the Market Monitor already has such access. PJM explains that the Market Monitor has direct access because it meets with the PJM Board regularly as required by Attachment M to the PJM OATT, and that these meetings are not open meetings.[129]  PJM additionally explains that the Market Monitor has indirect access because it has regular meetings with OPSI, and the OPSI Advisory Committee regularly meets with the PJM Board.[130]

## 2.    Comments, Protests, and Other Answers

### a.    Comments in Support

51.     OPSI, West Virginia Commission, Joint Consumer Advocates, Ohio Consumers' Counsel, and Public Citizen support granting the Market Monitor's complaint.

52.     Several commenters argue that Attachment M permits the Market Monitor to attend Liaison Committee meetings once the Market Monitor determines, at its discretion, that attendance at Liaison Committee meetings is necessary for the Market Monitor to perform its functions.[131]  Joint Consumer Advocates argue that the Liaison Committee's purpose, which is to "ensure open exchanges and information sharing on topics of relevance to the Members and the Board of Managers" indicates that the Liaison

---

[126] *Id.* at 8.

[127] *Id.* at 10.

[128] *Id.*

[129] *Id.* at 8, 10-11.

[130] *Id.* at 11.

[131] Joint Consumer Advocates Comments on Market Monitor Complaint at 2; Ohio Consumers' Counsel Comments on Market Monitor Complaint at 2; West Virginia Commission Comments on Market Monitor Complaint at 2.

Docket Nos. EL23-45-000 and EL23-50-000                                     - 24 -

Committee will discuss topics that fall within the Market Monitor's functions under Attachment M.[132]

53.     West Virginia Commission argues that neither the Members Committee nor the PJM Board have the authority to enforce the Liaison Committee Charter if doing so would violate the OATT.  Finally, West Virginia Commission contends that arguments about how the Market Monitor's complaint does not affect rates or about how the Market Monitor's attendance at Liaison Committee meetings would have a chilling effect lack credibility.[133]

54.     OPSI argues that the Liaison Committee is one of PJM's primary and most important stakeholder committees.[134]  OPSI contends that excluding the Market Monitor from Liaison Committee meetings affects the dialogue between states and the Market Monitor, and inhibits the Market Monitor's ability to provide a full and informed opinion on which state commissions can rely as they consider proposals.

55.     Ohio Consumers' Counsel argues that Order No. 2000 and Order No. 719 require independence, transparency, and openness.[135]  Ohio Consumers' Counsel contends that allowing the Market Monitor to attend Liaison Committee meetings is consistent with those requirements.  Joint Consumer Advocates also assert that transparency in PJM is important, and that PJM's excluding the Market Monitor from Liaison Committee meetings undermines transparency.[136]

56.     Public Citizen argues that even if the Commission grants the Market Monitor's complaint, other entities, like Public Citizen, will still be unable to access Liaison Committee meetings.[137]

---

[132] Joint Consumer Advocates Comments on Market Monitor Complaint at 2-3 (quoting Liaison Committee Charter at 1).

[133] West Virginia Commission Comments on Market Monitor Complaint at 2.

[134] OPSI Comments on Market Monitor Complaint at 3.

[135] Ohio Consumers' Counsel Comments on Market Monitor Complaint at 6.

[136] Joint Consumer Advocates Comments on Market Monitor Complaint at 3.

[137] Public Citizen Comments on Market Monitor Complaint at 1.

## b.     Protests and Comments in Opposition

57.     Indicated PJM Members and Trade Associations protest granting the Market Monitor's complaint.

58.     Indicated PJM Members and Trade Associations assert that Attachment M requires the Market Monitor to participate "consistent with the rules applicable to all PJM stakeholders."[138] Because the Market Monitor is not a PJM Member and consistent with the Liaison Committee Charter, Indicated PJM Members and Trade Associations argue that the Market Monitor is not permitted to attend Liaison Committee meetings.[139]

59.     Indicated PJM Members and Trade Associations argue that the Market Monitor has provided insufficient evidence to satisfy its FPA section 206 burden.[140] Specifically, Indicated PJM Members assert that the Market Monitor has not provided evidence as to why it is appropriate or necessary for it to attend Liaison Committee meetings.[141] Indicated PJM Members argue that Liaison Committee meetings do not implicate the Market Monitor's functions under Attachment M to the PJM OATT. Indicated PJM Members contend that the Liaison Committee's purpose is to facilitate an exchange of views between PJM Members and the PJM Board, and that no market actions are taken or market structures proposed during Liaison Committee meetings.[142] Moreover, Indicated PJM Members note that individual lobbying by a PJM Member is prohibited during Liaison Committee meetings.[143]

60.     Indicated PJM Members and Trade Associations argue that the Market Monitor's attendance at Liaison Committee meetings could upset the candid and open discussion at

---

[138] Indicated PJM Members Protest of Market Monitor Complaint at 4; Trade Associations Protest of Market Monitor Complaint at 5-6 (citing ATTACHMENT M, OATT ATTACHMENT M (5.0.0), § IV.G).

[139] Indicated PJM Members Protest of Market Monitor Complaint at 4-5; Trade Associations Protest of Market Monitor Complaint at 5-7.

[140] Indicated PJM Members Protest of Market Monitor Complaint at 7; Trade Association Protest of Market Monitor Complaint at 3-4.

[141] Indicated PJM Members Protest of Market Monitor Complaint at 7.

[142] *Id.* at 2-3.

[143] *Id.* at 5-6.

those meetings.[144]  For example, Indicated PJM Members and Trade Associations note that among the Liaison Committee's recent topics of discussion is future market monitoring contracts.  Allowing the Market Monitor to participate in or observe this discussion would, according to Indicated PJM Members, create a conflict of interest.[145]

61.     Lastly, Indicated PJM Members and Trade Associations argue that the Commission should not intercede in matters related to internal RTO governance.  Trade Associations also argue that the Liaison Committee's discussions are not subject to the Commission's jurisdiction because they do not affect rates, terms, and conditions of service.[146]  Citing *CAISO v. FERC* and *RTO Insider*, Indicated PJM Members argue that the Liaison Committee Charter eligibility requirements should be left up to the purview of PJM and Liaison Committee members.[147]  Trade Associations argue that the circumstances here are comparable to those in *RTO Insider*, in which the Commission held that attendance at meetings where there is no voting is "too attenuated from the voting process to directly affect jurisdictional rates."[148]  Trade Associations contend that nothing in the Liaison Committee directly affects rates, as the Liaison Committee's purpose is to facilitate communication between PJM Members and the PJM Board.[149]

62.     Trade Associations also contend that the Market Monitor's argument that it cannot state its independent views if it is not allowed to attend Liaison Committee meetings is misplaced because only sector representatives participate during Liaison Committee meetings.[150]  Trade Associations further note that the agendas from Liaison Committee meetings are publicly available, such that the Market Monitor is incorrect to argue that it is deprived of information when it is not allowed to attend Liaison Committee meetings.

---

[144] Indicated PJM Members Protest of Market Monitor Complaint at 5; Trade Associations Protest of Market Monitor Complaint at 7.

[145] Indicated PJM Members of Market Monitor Complaint at 6.

[146] Trade Associations Protest of Market Monitor Complaint at 3.

[147] Indicated PJM Members Protest of Market Monitor Complaint at 8-9.

[148] Trade Associations Protest of Market Monitor Complaint at 4 (quoting *RTO Insider*, 167 FERC ¶ 61,021 at P 47).

[149] Trade Associations Protest of Market Monitor Complaint at 4-5.

[150] *Id.* at 8.

### c.     Market Monitor's Answer

63.     The Market Monitor contends that none of the arguments that PJM makes demonstrate that the Liaison Committee is not a stakeholder committee.[151]  The Market Monitor further contends that PJM's definition of stakeholder committee is unduly narrow.  In any event, according to the Market Monitor, that unduly narrow definition is not relevant because the language of Attachment M covers "stakeholder processes" which is broader than just committees.[152]

64.     The Market Monitor argues that PJM cannot enforce the Liaison Committee Charter if it conflicts with the OATT.[153]  Therefore, according to the Market Monitor, PJM should have rejected the Members' efforts to enforce the Liaison Committee Charter by restricting attendance at Liaison Committee meetings to PJM Members.[154]

65.     The Market Monitor rebuts arguments that its attendance at Liaison Committee meetings is not necessary for the market monitoring function, stating that the agendas for Liaison Committee meetings always include topics related to PJM markets, and sometimes include topics related to the market monitoring function.[155]  According to the Market Monitor, the PJM Board has authority over PJM's regulatory filings, and thus conversations with the Board are related to the market monitoring function.  The Market Monitor further argues that its regular meetings with the PJM Board are not relevant to the Market Monitor's need to hear the conversations at Liaison Committee meetings.[156]  The Market Monitor also contends that its attendance at Liaison Committee meetings cannot, under Attachment M, be restricted to "listen-only" mode because Attachment M permits the Market Monitor's participation on the same terms as other stakeholders.[157]

66.     The Market Monitor refutes arguments that its attendance at Liaison Committee meetings will have a chilling effect by stating that Members should stand behind their

---

[151] Market Monitor Answer to PJM Answer to Market Monitor Complaint at 2.

[152] *Id.* at 2-3.

[153] *Id.* at 3.

[154] *Id.*

[155] *Id.* at 4.

[156] *Id.* at 5.

[157] *Id.* at 5-6.

communications to the Board and that the stakeholder process should be transparent.[158] The Market Monitor argues that it has an interest in all topics discussed at Liaison Committee meetings, including topics related to the market monitoring function.[159]

67.    The Market Monitor rebuts arguments related to the Commission's lack of jurisdiction over attendance at Liaison Committee meetings by arguing that RTOs "are creatures of the Commission" and "[t]he Commission has jurisdiction over PJM based on its status as an RTO."[160]   In turn, according to the Market Monitor, *RTO Insider* and *CAISO v. FERC* are not relevant to the Market Monitor's complaint.[161]

## IV.    **Discussion**

### A.    **Procedural Matters**

68.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2023), the timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.  We also grant LS Power's and Solar Energy Industries Association's (SEIA) late-filed motions to intervene in Docket No. EL23-45-000 given their interests in the proceeding and the absence of undue prejudice or delay.

69.    Rule 213 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213 (2023), prohibits an answer to a protest or answer unless otherwise ordered by the decisional authority.  We accept all answers filed in Docket Nos. EL23-45-000 and EL23-50-000 because they have provided information that assisted us in our decision-making process.

70.    Pursuant to Rule 216 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.216 (2023), West Virginia Commission's motion to lodge filed in Docket No. EL23-45-000 is withdrawn.[162]

---

[158] *Id.* at 6.

[159] *Id.*

[160] *Id.* at 9.

[161] *Id.* at 9-10.

[162] *See* 18 C.F.R. § 385.216(b)(1) ("The withdrawal of any pleading is effective at the end of 15 days from the date of filing of a notice of withdrawal, if no motion in opposition to the notice of withdrawal is filed within that period and the decisional authority does not issue an order disallowing the withdrawal within that period.").

### B.    Substantive Matters

71.    As discussed below, we deny both complaints because West Virginia Commission and the Market Monitor have each failed to satisfy their respective burden under FPA section 206.

### 1.    West Virginia Commission's Complaint

72.    We find that West Virginia Commission has not satisfied its burden under FPA section 206.  West Virginia Commission advances three principal arguments.  We disagree with each, as discussed in more detail below.

### a.    PJM Is Not Violating the Operating Agreement Because the Liaison Committee Is Not a Standing Committee

73.    West Virginia Commission argues that PJM is violating its Operating Agreement because the Liaison Committee, according to West Virginia Commission, is a Standing Committee.  West Virginia Commission argues further that if the Liaison Committee is a Standing Committee, then PJM must, per Operating Agreement section 8.2.2, permit West Virginia Commission to attend Liaison Committee meetings.[163]  We disagree with West Virginia Commission's assertion that the Liaison Committee is a Standing Committee under the Operating Agreement.

74.    We begin with an analysis of the Operating Agreement's relevant sections. Section 1 defines Standing Committees as the "Members Committee, the committees established and maintained under Operating Agreement, section 8.6, and such other committees as the Members Committee may establish and maintain from time to time."[164]  Section 8.6 does not explicitly reference the Liaison Committee as a Standing Committee.  Section 8.6 lists only the Markets and Reliability Committee as a Senior Standing Committee, and lists the Market Implementation Committee, Planning Committee, Operating Committee, and Risk Management Committee as Standing Committees.[165]

---

[163] 8.2, OA 8.2 Representatives. (1.0.0), § 8.2.2 ("[E]ach State electric utility regulatory commission with regulatory jurisdiction within the PJM Region, may nominate one representative to serve as an ex officio non-voting member on each of the Standing Committees").

[164] S–T, OA Definitions S – T (22.0.0).

[165] 8.6, OA 8.6 Senior, Standing, and Other Committees. (2.0.0).

75.    Section 8.6 also allows the Members Committee to establish or dissolve other Standing Committees.[166]  But the Members Committee did not establish the Liaison Committee.  Rather, the PJM Board together with the Members Committee created the Liaison Committee as a joint effort outside of the Standing Committees.[167]  In addition, other Standing Committees established per section 8.6 include in their respective charters a statement indicating that they are Standing Committees.[168]  The Liaison Committee Charter does not include such a statement.[169]

76.    Moreover, we disagree with West Virginia Commission's argument related to Operating Agreement section 8.6.3.  Section 8.6.3 allows Standing Committees to "form, select the membership, and oversee the activities, of such other committees, subcommittees, task forces, working groups or other bodies"—i.e. non-standing committees.[170]  Section 8.6.3 states that "each such group shall terminate automatically upon completion of its assigned tasks and, if not terminated, shall terminate two years after formation unless reauthorized by the Standing Committee that directed its formation."[171]  West Virginia Commission asserts that the Liaison Committee does not comply with this provision because it has not been terminated, and has not been reauthorized.  Therefore, according to West Virginia Commission, the Liaison

---

[166] *Id.* ("The Members Committee may establish or dissolve other Standing Committees from time to time.").

[167] *See* Liaison Committee Charter at 1 (explaining in Liaison Committee's mission statement that "the Members *and the Board* agree to create a Liaison Committee" (emphasis added)); *see also* PJM Answer to West Virginia Commission Complaint at 7.

[168] *See, e.g.*, Risk Management Committee Charter at 1, https://www.pjm.com/-/media/committees-groups/committees/rmc/postings/rmc-charter.ashx ("The [Risk Management Committee] is a Standing Committee that reports to the Markets and Reliability Committee); *see also* PJM Answer to West Virginia Commission Complaint at 6-7.

[169] Consistent with the Operating Agreement, neither the Liaison Committee Charter nor PJM's Business Practices Manual describe or reference the Liaison Committee as a Standing Committee.  *See* Liaison Committee Charter at 1-3; PJM Manual 34 at 92-93 (Section 15.2).

[170] 8.6, OA 8.6 Senior, Standing, and Other Committees. (2.0.0), § 8.6.3.

[171] *Id.*

Committee cannot be a non-standing committee, which means it must be a Standing Committee.

77.    Section 8.6.3 is not applicable to the Liaison Committee.  As PJM explains, Standing Committees did not create the Liaison Committee, which section 8.6.3 requires. Rather, we agree with PJM in that we find that the Liaison Committee is a joint effort of the PJM Members and the PJM Board to facilitate communication outside of the Standing Committees.[172]

78.    Even if section 8.6.3 did apply, we note that the Liaison Committee Charter contains a "Process Assessment."[173]  PJM explains that this "Process Assessment" was used to reauthorize the Liaison Committee.  Thus, the Members Committee, which is the Standing Committee that was involved in the Liaison Committee's formation, provided a process for reauthorizing the Liaison Committee, as section 8.6.3 requires.

> **b.    PJM Is Not Violating Order No. 2000 or Order No. 719 Because Neither Order Requires PJM to Permit the West Virginia Commission to Attend Liaison Committee Meetings**

79.    We disagree that PJM's excluding West Virginia Commission from Liaison Committee meetings violates Order No. 2000.  As relevant here, the Commission in Order No. 2000 required each RTO to have "a decision making process that is independent of control by any market participant or class of participants."[174]  The Liaison Committee, however, does not make decisions.[175]  Moreover, the Liaison Committee's structure mitigates against the potential for any market participant or class of market

---

[172] *See supra* note 167 and accompanying discussion.

[173] Liaison Committee Charter at 3 ("After one year following the implementation of the Liaison Committee, the Members Committee and PJM Board shall assess the efficacy of the Liaison Committee process in meeting its mission and shall take appropriate action.").

[174] 18 C.F.R. § 35.34(j)(1)(ii) (2023).  *See* Order No. 2000, FERC Stats & Regs. ¶ 31,089 at ¶ 31,061; *PJM Interconnection, L.L.C.*, 96 FERC ¶ 61,061 (2001).

[175] Liaison Committee Charter at 1 ("The PJM Liaison Committee will not have the authority to vote on or to decide any matters or to act as a substitute for the normal decision-making processes of the Members Committee or the Board of Managers.").

participants to exert undue influence on PJM or the PJM Board.[176]  Specifically, individual member lobbying is prohibited.[177]  Given the features that mitigate the potential for the Liaison Committee to enable undue influence on the PJM Board,[178] and given the context of the broader PJM decision making process,[179] we find that West Virginia Commission has not proven its exclusion would prevent PJM or the PJM Board from maintaining independence as required by Order No. 2000.

80.     Order No. 2000 also requires that "formal and informal mechanisms must exist to ensure that stakeholders can convey their concerns to the . . . board."[180]  We find that, through its membership in OPSI, West Virginia Commission has a formally-recognized avenue to communicate its concerns to the PJM Board.[181]  Order No. 2000 requires only that parties have access to the Board, not that every party must be included in every meeting between the Board and other parties.  Lastly, the Commission in Order No. 2000 did "not impose any specific requirements on the role of state agencies in RTOs" and thus did not specifically prescribe how that role must be fulfilled.[182]  We find that

---

[176] *Id.* ("Per sections 7.7 and 11.1 of the Operating Agreement, this process is intended to allow member interests to be heard while avoiding (1) undue influence by any particular Member or group of Members on the operation of PJM and (2) Member management of the business of PJM.").

[177] *Id.* at 1 ("[T]he Liaison Committee shall not be a forum in which individual Member lobbying occurs.").

[178] Notably the inability of the committee "to vote on or to decide any matters or to act as a substitute for the normal decision-making processes of the Members Committee or the Board of Managers," the prohibition on individual Member lobbying, and the ability of all Members and consumer advocates to attend meetings in listen-only mode ensure the Liaison Committee is not being inappropriately used as part of a decision making process.  *Id.* at 1, 2.

[179] *See infra* PP 80-82 (discussing how PJM's other governance mechanisms meet the requirements of Order No. 2000).

[180] Order No. 2000, FERC Stats & Regs. ¶ 31,089 at ¶ 31,074.

[181] *See* OPSI MOU at 3 ("The PJM Board of Managers will meet at least annually with OPSI to discuss matters of mutual interest and at such other times as may be mutually agreed upon.").

[182] Order No. 2000, FERC Stats & Regs. ¶ 31,089 at ¶ 31,074.

providing state commissions with private access to the PJM Board through membership in OPSI sufficiently complies with Order No. 2000.[183]

81.     We likewise disagree that excluding West Virginia Commission from Liaison Committee meetings violates Order No. 719.  As relevant here, per Order No. 719's RTO/ISO responsiveness requirement, RTOs/ISOs must establish procedures to ensure that any stakeholder affected by the operation of the RTO/ISO "is permitted to communicate the customer's or other stakeholder's views to the [RTO/ISO's] board of directors."[184]  Moreover, RTOs/ISOs must continue, over time, to consider customer and stakeholder needs as the architecture or market environment of the RTO/ISO changes.[185]

82.     We find that PJM currently satisfies these Order No. 719 requirements.  The Liaison Committee represents just one element of PJM's internal governance structure.  The varied elements of that multi-faceted structure provide all stakeholders, including West Virginia Commission, with the ability to participate in stakeholder meetings and with access to the PJM Board.  For example, West Virginia Commission participates at Standing Committee meetings where it presents topics to the PJM Board.[186]  And West Virginia Commission, through its membership in OPSI, has opportunities to meet directly with the PJM Board to discuss issues of mutual concern.[187]  Order No. 719 does not require PJM to allow every stakeholder to attend any meeting between another group of stakeholders and the PJM Board.

---

[183] Under West Virginia Commission's position that all parties have a right to be included in all meetings with the PJM Board, OPSI's meetings with the Board would have to be open to other stakeholders.  We disagree that Order No. 2000, in requiring that all parties have access to the Board, prevents the Board from obtaining information from certain parties in the absence of other parties.

[184] 18 C.F.R. § 35.28(g)(6)(i) (2023).

[185] Order No. 719 Compliance Order, 133 FERC ¶ 61,071 at P 38.  To this end, PJM has developed a "Stakeholder Process Forum."  The Stakeholder Process Forum is a non-decisional group that provides informational reporting to the Members Committee.  *See* Stakeholder Process Forum, PJM, https://www.pjm.com/committees-and-groups/forums/stakeholder-process-forum.

[186] *See* 8.2, OA 8.2 Representatives (2.0.0), § 8.2.2.

[187] *See supra* note 181.

> ### c.    PJM Is Not Discriminating Unduly Because State Consumer Advocates and State Commissions Are Not Similarly Situated

83.    We disagree with West Virginia Commission's assertion that PJM's decision not to allow West Virginia Commission to attend Liaison Committee meetings is unduly discriminatory.  West Virginia Commission contends that, because state consumer advocates participate in the Liaison Committee, PJM is unduly discriminating by not including state commissions.  Though state consumer advocates and state commissions are both *ex officio* PJM Members, we find that they are not similarly situated because, under the Operating Agreement, state consumer advocates have voting rights whereas state commissions do not.[188]

84.    We agree with PJM that state consumer advocates' voting rights in the End-Use Customer sector distinguish state consumer advocates from state commissions with respect to attendance at Liaison Committee meetings.[189]  As set forth in the Liaison Committee Charter, the Liaison Committee's membership consists of representatives from each PJM sector, including the End-Use Customer sector.[190]  Per section 8.2.3 of the Operating Agreement, as also stated above, state consumer advocates have voting rights in the End-Use Customer sector.[191]  Per section 8.2.2 of the Operating Agreement, state commissions do not.[192]  State consumer advocates therefore have an interest in viewing Liaison Committee meetings to inform their votes on the sector representatives which will represent them at the Liaison Committee, an interest which state commissions do not have.  We find that this distinction makes state consumer advocates and state commissions not similarly situated, despite both being *ex officio* PJM members.  Thus,

---

[188] *See Mo. River Energy Servs. v. FERC*, 918 F.3d 954, 958 (D.C. Cir. 2019) ("A mere difference in the treatment of two entities does not violate [the FPA's prohibition against undue discrimination]; instead, undue discrimination occurs only if the entities are similarly situated, such that there is no reason for the difference[,]" (internal quotations omitted)); *see also Tri-State Generation & Transmission Ass'n*, 184 FERC ¶ 61,099, at P 298 (2023); *ISO New England Inc.*, 170 FERC ¶ 61,011, at P 14 (2020).

[189] PJM Answer to West Virginia Commission Complaint at 13.

[190] Liaison Committee Charter at 2.

[191] 8.2, OA 8.2 Representatives (2.0.0), § 8.2.3.

[192] *Id.* § 8.2.2.

we find that there is no undue discrimination and deny West Virginia Commission's complaint.[193]

## 2. **Market Monitor's Complaint**

85.    We find that the Market Monitor has not satisfied its burden to show that PJM violates Attachment M to the PJM OATT by excluding the Market Monitor from the Liaison Committee.[194]   As relevant here, section IV.G of Attachment M states that "[t]he Market Monitoring Unit may, as it deems appropriate or necessary to perform its functions under this Plan, participate (consistent with the rules applicable to all PJM stakeholders) in stakeholder working groups, committees or other PJM stakeholder processes."[195]   The Market Monitor has not satisfied its burden to prove that the Liaison Committee is a stakeholder working group, committee or other PJM stakeholder process as contemplated by Attachment M.[196]   The Commission has previously explained that "[t]he stakeholder process is used to identify, review, and make decisions regarding proposed revisions to PJM's governing documents, processes, market and reliability design and operations."[197]   Moreover, the Commission has consistently discussed stakeholder processes as elements of a decision making process.[198]   The Market Monitor

---

[193] The Commission has "wide discretion" to determine what constitutes undue discrimination.  *See Mo. River Energy Servs. v. FERC*, 918, F.3d at 958.

[194] "In any proceeding under [section 206 of the Federal Power Act], the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant." 16 U.S.C. § 824e(b).

[195] *See* ATTACHMENT M, OATT ATTACHMENT M (5.0.0), § IV.G.

[196] Under the series-qualifier canon of statutory interpretation, "a modifier at the end of a series of nouns or verbs applies to the entire series." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1165 (2021).  In this case, the modifier "stakeholder" both before the series and in the final clause applies to all the terms, including the word "committee."

[197] *PJM Interconnection, L.L.C.*, 157 FERC ¶ 61,229, at P 10 (2016) (order accepting funding mechanism for Consumer Advocates of the PJM States).

[198] *See Atl. City Elec. Co.,* 117 FERC ¶ 61,169, at PP 2, 26 (2006) (explaining that a tariff proposal did not obtain a vote under PJM's "stakeholder process" and referring to a "stakeholder process" that failed to reach consensus on any one tariff proposal); *Pepco Energy Servs., Inc. v. PJM Interconnection, L.L.C.*, 128 FERC ¶ 61,051, at P 2 (2009) (referencing a "stakeholder process" that PJM began "to consider possible changes to . . . market rules"); *Advanced Energy Econ.*, 161 FERC ¶ 61,245, at P 71 (2017) (explaining that the "stakeholder process" is a forum to "develop proposed market rules").  We note

made no allegations in its Complaint that the Liaison Committee is involved in PJM decision making. In its Answer, the Market Monitor states that there is "*potential* for the Liaison Committee to affect Board decisions," but does not allege, let alone provide evidence, that the Liaison Committee is *actually* being used as part of a decision-making process.[199] As outlined above, the Liaison Committee's stated purpose is to facilitate communication between PJM's sector groups and the PJM Board and to help Members *understand* the PJM Board decision making process.[200] The Liaison Committee is not, on its face, an element of the decision making process regarding proposed revisions to tariff provisions, governing documents, processes, or market design and operations.[201] The Market Monitor does not allege any facts which lead us to find otherwise.

86. We also find that the Liaison Committee is not inconsistent with the independence of PJM, the PJM Board, or the Market Monitor. We note that the Market Monitor has ample opportunities to meet with the PJM Board, both directly and indirectly.[202] We also

_____

that PJM's Business Practice Manuals similarly discuss stakeholder processes. *See* PJM Business Practice Manual 34 (PJM Stakeholder Process), Revision 18, at 19 (Jan. 25, 2023) ("The goal of the stakeholder process is to efficiently, effectively and fairly identify, review and make decisions regarding proposed revisions to PJM's governing documents, processes, market and reliability design and operations.").

[199] Market Monitor Answer to PJM Answer to Market Monitor Complaint at 4 (emphasis added).

[200] *See supra* at § I.A.

[201] *See* Liaison Committee Charter at 1 ("The PJM Liaison Committee will not have the authority to vote on or to decide any matters or to act as a substitute for the normal decision-making processes of the Members Committee or the Board of Managers."); *see also* PJM Manual 34 at 93 (Section 15.2) ("The PJM Liaison Committee does not have the authority to vote on or to decide any matters or to act as a substitute for the normal stakeholder process."). Relatedly, stakeholder committee charters obligate those committees to follow the directives of a supervising committee, whereas the Liaison Committee's mission and activities are not subject to direction from any stakeholder committee, and the Liaison Committee Charter obligates the Liaison Committee to only write reports. *Compare* Market Implementation Committee Charter, at 1 (2022), https://pjm.com/-/media/committees-groups/committees/ mic/postings/mic-charter.ashx, *with* Liaison Committee Charter at 1, 3.

[202] *See* ATTACHMENT M, OATT ATTACHMENT M (5.0.0), § III.D.2 ("The PJM Board and the Market Monitor shall meet and confer from time to time on matters relevant to the discharge of the PJM Board's and the Market Monitoring Unit's duties under this Plan."). These meetings are not open to PJM Members, employees, or stakeholders, which enables the Market Monitor to communicate openly about the

find that PJM's stakeholder process enables the Market Monitor to participate in meetings where discussions occur between PJM Members, stakeholders, and PJM Board members on proposed tariff provisions, governing documents, processes, or market designs and operations.[203]  For example, the Market Monitor attends and is active during the PJM Members Committee meetings, at which at least two PJM Board members are present,[204] and during the semi-annual General Session.[205]  These features help ensure the Market Monitor's independence, as well as the independence of the PJM Board.  We therefore find that the Market Monitor has not satisfied its burden and deny its complaint.

---

Market Monitoring function.  Moreover, the Market Monitor has indirect access to the PJM Board through the OPSI Advisory Committee, which meets with the Market Monitor and the PJM Board on a regular basis, and which "provide[s] advice to the Commission, Market Monitor, the PJM Board, stakeholder committees, and stakeholder working groups regarding any matter concerning the Market Monitoring Unit or the Market Monitoring Plan."  ATTACHMENT M, OATT Attachment M (5.0.0), § III.G.  Lastly, the Market Monitor can access the agendas for Liaison Committee meetings, which are posted publicly.  Liaison Committee Charter at 2.

[203] Order No. 719 Compliance Order, 133 FERC ¶ 61,071 at P 51.

[204] *See, e.g.*, ARR/FTR Market Design and Design Components:  IMM Proposals (Nov. 17, 2021), https://www.monitoringanalytics.com/reports/Presentations/2021/IMM_MC_ARR_FTR_ Market_Design_and_Design_Components_IMM_Propsals.pdf; Letter from Market Monitor to PJM and PJM Members on Opportunity Cost OA Language (Sept. 24, 2018), https://www.monitoringanalytics.com/reports/Presentations/2018/IMM_MC_Opportunity _Cost_OA_Language_20180927.pdf.

[205] *See, e.g.*, 2016 Year In Review (May 16, 2017), https://www.monitoringanalytics.com/reports/Presentations/2017/IMM_2016_Year_in_R eview_20170516.pdf.  General Sessions are special meetings of the Members, the Board of Managers and PJM Staff, and are held in an open forum.  The semi-annual General Session meetings are also open meetings that are held between PJM stakeholders and the PJM Board.  Typically, General Sessions are held twice per year; at the Annual Meeting and in the fourth quarter each year.  *See* Order No. 719 Compliance Order, 133 FERC ¶ 61,071 at PP 27, 57; *see also*, PJM Manual 34 at 93 (Section 15.3).

Docket Nos. EL23-45-000 and EL23-50-000                                    - 38 -

<u>The Commission orders</u>:

     (A)    West Virginia Commission's complaint is hereby denied, as discussed in the body of this order.

     (B)    The Market Monitor's complaint is hereby denied, as discussed in the body of this order.

By the Commission.  Commissioner Christie is concurring in the result in Docket No. EL23-45-000 and dissenting in Docket No. EL23-50-000 with a separate statement attached.

( S E A L )

Debbie-Anne A. Reese,
Acting Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Public Service Commission of West Virginia v. PJM Interconnection, L.L.C. | Docket Nos. | EL23-45-000 |
| Independent Market Monitor for PJM v. PJM Interconnection, L.L.C. | | EL23-50-000 |

(Issued March 1, 2024)

CHRISTIE, Commissioner, *concurring in the result in EL23-45 and dissenting in EL23-50*:

1.      I agree with this Order's denial of the Federal Power Act (FPA) section 206 complaint filed by the Public Service Commission of West Virginia (PSC WV), because I agree that the PSC WV has failed to meet its burden of proof for a section 206 complaint. I cannot join all of the various rationales offered in the Order to support this denial, however, so I concur only with the result, as explained more fully below.

2.      I dissent from the Order's denial of the complaint filed by the PJM Independent Market Monitor (IMM) alleging a violation of Attachment M of the PJM Open Access Transmission Tariff (OATT) because I think the Order misses the vital purpose of the IMM in PJM operations, which is embodied in Attachment M.

3.      First, turning to the West Virginia complaint:  The PSC WV complains about the exclusion of its representative from observing and attending meetings of the "Liaison Committee" in PJM.  There exists a much broader issue concerning RTO governance and decision-making that deserves attention, however, that unfortunately is not teed up in this proceeding, which I regard sadly as a missed opportunity.  That broader issue resonates across all RTOs under Order No. 2000,[1] and with regard to the states is much more significant than whether a representative of a state commission can attend a particular committee meeting.

4.      Specifically, that broader issue is the very real and compelling need to redefine and elevate the roles and authorities of state regulators in *all* RTOs.  State regulators regulate the *retail* rates paid by consumers, the rates that actually determine the monthly

---

[1] *Regional Transmission Orgs.*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089 (1999) (cross-referenced at 89 FERC ¶ 61,285), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000) (cross-referenced at 90 FERC ¶ 61,201), *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).

power bills that consumers must pay. Even though this retail rate authority is specifically reserved to state regulators under the FPA, it is undeniable that FERC-regulated RTOs have a huge impact on those retail monthly bills. The power markets that RTOs operate, while wholesale, obviously impact retail bills in every state in an RTO, not to mention that FERC over the years has intruded on state *retail* rate-making authority through orders such as Order No. 2222.[2] The transmission costs from RTO-planned transmission projects flow right through FERC formula rates into *retail* rates – and transmission costs in many states are frequently the fastest growing part of the consumer's monthly power bill.[3]

5.      Yet since Order No. 2000 created the world of modern RTOs, state regulators have been largely frozen out of any serious role in RTOs' actual decision-making,[4] even when those decisions have a direct and material impact on retail rates paid by their states'

---

[2] *Participation of Distributed Energy Resource Aggregations in Markets Operated by Regional Transmission Organizations and Independent System Operators*, Order No. 2222, 172 FERC ¶ 61,247 (2020), *order on reh'g*, Order No. 2222-A, 174 FERC ¶ 61,197, *order on reh'g*, Order No. 2222-B, 175 FERC ¶ 61,227 (2021); *see, e.g.*, Order No. 2222-A, 174 FERC ¶ 61,197 (Christie, Comm'r, dissenting at PP 3, 5) (footnote omitted) (emphasis added) (available at https://www.ferc.gov/news-events/news/item-e-1-commissioner-mark-c-christie-dissent-regarding-participation-distributed) ("This order – and its predecessor – intentionally seize from the states and other authorities their historic authority to balance the competing interests of deploying new technologies while maintaining grid reliability and protecting consumers from unaffordable costs. . . . *Order No. 2222-A is not 'cooperative federalism,' but its opposite. It undermines the overarching policy framework that Congress incorporated into the Federal Power Act decades ago: federal regulation of wholesale rates and the bulk power system; state regulation of retail rates and the local distribution grid.*").

[3] *See, e.g.*, PJM IMM *2023 Quarterly State of the Market Report for PJM: January - September 2023* at 5, 20 ("Starting in the third quarter of 2019, the cost of transmission per MWh of wholesale power has been higher than the cost of capacity.").

[4] There have been some minor exceptions. The Regional State Committee in SPP (SPP RSC) has historically had some degree of a decision-making role in transmission cost allocation, albeit subject to board control, and the Organization of MISO States, Inc. (OMS) may request that MISO make changes, pursuant to FPA section 205, to MISO's transmission cost allocation. These examples, however, while welcome, do not give state regulators anywhere near the role in RTO decision-making they should have on matters that directly affect their consumers' monthly power bills, such as transmission costs.

consumers.  Order Nos. 719[5] and 1000,[6] as well as other relevant FERC orders, continued the essential exclusion of state regulators[7] from such critically important decisions as regional cost allocation for transmission projects.  The practical exclusion since Order No. 2000 of state authorities from serious decision-making roles in RTOs on matters that directly affect the power costs paid by consumers, is an issue that merits its own section 206 complaint or other proceeding.[8]

6.     I would note that simply allowing state regulators or their staff to sit in the room during "stakeholder" meetings (along with a cast of hundreds) or otherwise be "consulted" on some decisions, simply does not represent an adequate role for the states.[9]

_____

[5] *Wholesale Competition in Regions with Organized Elec. Mkts.*, Order No. 719, 125 FERC ¶ 61,071 (2008), *order on reh'g*, Order No. 719-A, 128 FERC ¶ 61,059, *order on reh'g*, Order No. 719-B, 129 FERC ¶ 61,252 (2009).

[6] *Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g & clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth.* v. *FERC*, 762 F.3d 41 (D.C. Cir. 2014).

[7] While citing state regulators, I also include, as appropriate, other relevant electrical power regulatory authorities, such as self-regulating public power agencies and electric co-operatives.

[8] Whether in a section 206 proceeding or in one or more technical conferences, the issue of RTO governance and decision-making procedures is one that is timely for a FERC proceeding.  The issue has brought forth various interesting ideas and proposals ("interesting" does not mean I endorse the ideas).  *See, e.g.*, Tony Clark & Vince Duane, *Who Owns the RTO?  Why RTO Governance is an Achilles Heel in the Clean Grid Transition*, Nov. 2021, (available at https://www.wbklaw.com/news/white-paper-who-owns-the-rto/); *see also* Ari Peskoe, *Replacing the Utility Transmission Syndicate's Control*, ENERGY LAW JOURNAL (2023), (available at https://www.eba-net.org/wp-content/uploads/2023/11/8-Peskoe547-618.pdf).  Especially, given the continuing and growing debate over regional cost allocation for public policy transmission projects in multi-state RTOs, this issue is ripe for a thorough examination in a series of technical conferences or other general proceedings.

[9] To give credit where credit is due, I would note that, as a state commissioner in PJM for 17 years, I always found that it was never a problem for state regulators to meet with and discuss issues with PJM's Board and senior management.  The PJM Board and senior management always attended both fall and spring meetings of the Organization of PJM States, Inc. (OPSI) and OPSI members were regularly invited to attend the PJM annual meeting and occasional PJM Board meetings.  Generally the OPSI and PJM

States are constitutional entities with inherent police-power regulatory authority over utilities and rates. In the field of utility regulation, state regulators are the true representatives of the *public* interest within their states. I would further add that empowering states in RTO decision-making provides no justification for giving the myriad of RTO "stakeholders" an even greater role in RTO governance and decision-making than they already have. In RTO parlance and practice, except for state consumer advocates, "stakeholders" is typically a euphemism for rent-seeking special interests, including organizations pursuing the interests of their donors and members. One of the fundamental flaws in RTO processes since Order No. 2000 has been the enabling of rent-seeking special interests effectively to influence through RTO "stakeholder" processes the rules and practices that affect their own monetary and other interests.

7.      As to why I do not join all the reasons offered in today's Order for denying the PSC WV complaint, I believe it goes into too much detail as to, among other things, whether the Liaison Committee is a "Standing Committee" under the PJM OATT or not, whether it is part of the RTO's "decision-making" process under Order No. 2000 or not, whether the exclusion of the PSC WV representative violates the so-called "responsiveness" criteria of Order No. 719[10] or not, and generally engages in too much procedural parsing of this Commission's various orders governing RTO procedures and governance, as well as textual provisions of the OATT, that frankly, I regard as so much "how many angels can dance on the head of a pin," legalistic hairsplitting. While I will concede the need to comply with the Administrative Procedure Act (APA), which frequently drives such over-analysis, too much of the reasoning and conclusions expressed therein I find simply unnecessary or not compelled by logic.

8.      Rather than a long and detailed analysis on whether PJM has complied with FERC's many efforts over the years to exert control, often to a micromanagement level, over RTO governance and operating procedures, I believe the focus should be on the

---

Boards met together at least three times a year. Further, PJM senior staff and Board members were regularly available for individual phone calls and other means of one-on-one communications on specific issues. PJM staff held regular teleconferences with state staff. But while communication channels between OPSI states and PJM were robust, such opportunities do not constitute the type of decision-making role on matters that affect each state's consumers, such as cost allocation, that states should have.

[10] The four "responsiveness criteria" required of an RTO's governing board in Order No. 719 are: "(1) inclusiveness, (2) fairness in balancing diverse interests, (3) representation of minority positions, and (4) ongoing responsiveness." *See, e.g.*, Order No. 719, 125 FERC ¶ 61,071, at PP 7, 477. These sound more like the nebulous recommendations of an organizational management consultant, rather than serious requirements for RTO decision-making.

statute itself.  On that score I agree with the Order's determination that the PSC WV has simply not met its burden of proof to show either that PJM violated its tariff or otherwise has acted in a manner that results in unjust and unreasonable rates, or is unduly discriminatory or preferential.  I would add that even if the PSC WV complaint were granted, that would not address the much more significant issue of the states' proper role in RTO decision making, in contrast to the IMM complaint which goes to the very purpose of the IMM.

9.      So now turning to the IMM complaint:  I dissent because the IMM has met its section 206 burden in this complaint.  The core issue here involves Attachment M of the PJM OATT, which explicitly provides for the IMM's right – exercised by the IMM in its sole discretion – to select and attend stakeholder working groups, committees or other PJM stakeholder processes that the IMM deems appropriate and necessary to perform its vitally important duties.[11]  On this complaint, while an examination of Attachment M's text is necessary, even more important to consider is the *purpose* of Attachment M with regard to the IMM's vital role, and on this point we should not miss the forest for the trees.

10.     While today's Order nominally recognizes the language in Attachment M, it wrongly insists that because the Liaison Committee does not identify, review, *or* make any decisions concerning the PJM tariffs or markets it cannot be a stakeholder process and therefore the IMM has no right to attend.[12]  This explanation offers no basis at all for the majority's finding here.  First, the IMM's discretion to attend PJM events is not just as to a stakeholder process, but as to "stakeholder *working groups*, *committees or other* PJM *stakeholder processes*" – a very broad array of events to say the least.[13]  Second, I

---

[11] Specifically, section IV.G of Attachment M states that "[t]he Market Monitoring Unit may, as it deems appropriate or necessary to perform its functions under this Plan [referring to Attachment M which is the PJM Market Monitoring Plan], participate (consistent with the rules applicable to all PJM stakeholders) in stakeholder working groups, committees or other PJM stakeholder processes."  ATTACHMENT M, OATT ATTACHMENT M (5.0.0), § IV.G.

[12] Order at P 85 (footnotes omitted) ("The Commission has previously explained that '[t]he stakeholder process is used to identify, review, and make decisions regarding proposed revisions to PJM's governing documents, processes, market and reliability design and operations.'  Moreover, the Commission has consistently discussed stakeholder processes as elements of a decision making process. . . .  The Liaison Committee is not, on its face, an element of the decision making process regarding proposed revisions to tariff provisions, governing documents, processes, or market design and operations.").

[13] *See* ATTACHMENT M, OATT ATTACHMENT M (5.0.0), § IV.G (emphasis

think we can all agree that a process is series of actions leading to an end result.[14] So the fact that one step in a Board decision-making process may involve meeting with the Liaison Committee, which Committee does not make any decisions, is of no consequence. It is a process.[15] Third, the idea that the Liaison Committee does not identify or review any issues related to, *inter alia*, the PJM tariff or markets seems non-sensical to say the least and would undoubtedly be a surprise to those members of the Liaison Committee who undoubtedly believe that they are addressing and identifying issues of consequence to the PJM tariff and markets to the PJM Board. Moreover, it is contrary to the evidence presented by the IMM.[16]

11.     Next, the Order goes on to note that the IMM has "ample opportunities" to meet with the PJM Board and engage with other stakeholders.[17] Perhaps. And also not surprising given the IMM's authorities and obligations under Attachment M. But this statement actually ignores the IMM's complaint rather than answers why it is being denied. The IMM does not disagree that it has these other opportunities.[18] Instead, the

_____

added).

[14] If needed, I'd cite you to *Webster's Dictionary* which provides as one of its definitions that a process is "a series of actions or operations conducing to an end." https://www.merriam-webster.com/dictionary/process?src=search-dict-box.

[15] Indeed, as the IMM points out: "PJM and Indicated Members ignore the obvious potential for the Liaison Committee *to affect Board decisions, including decisions that affect the markets*. A cursory *review of agendas at the Liaison Committee shows the topics* <u>*always*</u> *include PJM markets and sometimes include the market monitoring function.* The Board has significant authority over PJM regulatory filings, including filings that do not require a PJM stakeholder process or majority vote, per PJM governance rules." IMM May 2, 2023 Answer at 4-5 (footnotes omitted) (emphasis added).

[16] *See, e.g., supra* n.15 (noting a review of the Liaison Committee agendas demonstrates the that topics "*always*" include PJM markets). In short then, not only has the IMM met its burden of proof under section 206, but this Order's arguments to the contrary are nothing short of unsatisfying.

[17] Order at P 86.

[18] IMM May 2, 2023 Answer at 5 (emphasis added) ("PJM argues . . . and Indicated Members argue . . . that the Market Monitor has alternative means to communicate with the Board. *Alternative means for the Market Monitor to communicate with the Board are irrelevant. Section IV.G does not include an exception to enforcement based on the existence of alternative stakeholder processes*.").

IMM seeks to enforce its right under Attachment M to attend the Liaison Committee meetings. And, in answer to that allegation, we come full circle to the notion that somehow the Liaison Committee does not "identify, review, and make decisions regarding proposed revisions to PJM's governing documents, processes, market and reliability design and operations" which, see my immediately preceding paragraph, we know is incorrect.

12.     In particular, I agree with the Organization of PJM States, Inc. (OPSI) which argues in favor of the Commission granting the IMM's complaint:

> One key aspect of retail regulator decision making involves understanding the perspective of the IMM. The IMM notes that "[e]xcluding the Market Monitor from stakeholder meetings compromises the ability of the Market Monitor to perform its function by depriving it of information exchanged in such meetings and the opportunity to state its independent views. The Market Monitor cannot effectively perform its function when it is excluded from stakeholder meetings." *When the PJM stakeholder process denies the IMM the ability to understand stakeholder perspectives, it not only impacts the IMM's ability to carry out its responsibilities, it also affects everyone that relies on the PJM markets and impacts retail regulators' ability to carry out their responsibilities.* For these reasons, the Commission should grant the Complaint.[19]

13.     I cannot emphasize strongly enough how much state regulators in OPSI rely upon the IMM for unvarnished, incisive and comprehensive analyses on PJM market operations and policies, as well as about planned changes to operations and policies. It is no exaggeration to say that without access to the IMM's information and analyses, state regulators would be woefully under-informed about what is happening in PJM that affects their state's consumers.

14.     I would add that, like the states, the IMM is not just another "stakeholder" and is not acting in its own monetary self-interest. The IMM has explicit obligations and rights under the tariff to perform its duties. And, for this reason, I do not believe that granting access to the IMM to attend Liaison Committee meetings in any way would justify granting similar access to other groups or "stakeholders" who may want to attend. The IMM is given very specific and vitally important duties, both in Order No. 719, which devotes an entire section to the importance of independent market monitoring in all RTOs, as well as, more specifically, in PJM's specific OATT Attachment M. If attending

---

[19] OPSI Apr. 17, 2023 Comments on Market Monitor Complaint at 2 (emphasis added) (footnotes omitted) (quoting IMM Complaint at 3-4).

Document Accession #: 20240301-3057     Filed Date: 03/01/2024

these meetings is "necessary or appropriate" to the IMM doing its job, then the IMM should be allowed to make that decision.

        For these reasons, I respectfully concur in the result as to the denial of the PSC WV complaint and dissent as to the denial of the IMM complaint.


_____

Mark C. Christie
Commissioner

Document Content(s)

EL23-45-000.docx.......................................................1

Attachment B

187 FERC ¶ 62,070
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Public Service Commission of West Virginia                Docket No. EL23-50-001
                    v.
PJM Interconnection, L.L.C.

Independent Market Monitor for PJM
                    v.
PJM Interconnection, L.L.C.

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW

(April 29, 2024)

Rehearing has been timely requested of the Commission's order issued on March 1, 2024, in this proceeding. *Public Service Commission of West Virginia*, 186 FERC ¶ 61,163 (2024).

In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713(f) (2023); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

Debbie-Anne A. Reese,
Acting Secretary.