**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

# In the United States Court of Appeals for the District of Columbia Circuit

### No. 24-1164

_____

INDEPENDENT MARKET MONITOR FOR PJM,
*Petitioner,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

_____

ON PETITION FOR REVIEW OF AN ORDER OF THE
FEDERAL ENERGY REGULATORY COMMISSION

_____

### BRIEF OF RESPONDENT
### FEDERAL ENERGY REGULATORY COMMISSION

_____

David L. Morenoff
  Acting General Counsel

Robert H. Solomon
  Solicitor

Jason T. Perkins
  Attorney
  jason.perkins@ferc.gov

For Respondent
Federal Energy Regulatory
  Commission
Washington, D.C. 20426

FEBRUARY 28, 2025

## CIRCUIT RULE 28(A)(1) CERTIFICATE

### A.    Parties

Dominion Energy Services, Inc. moved to intervene in this case on June 27, 2024 (ECF No. 2062096).  On August 14, 2024, the Court granted Dominion's motion along with all other pending motions to intervene in support of Respondent Federal Energy Regulatory Commission.  *See* ECF No. 2069791.  Otherwise, the parties before this Court are identified in Petitioner's Circuit Rule 28(a)(1) certificate.

### B.    Rulings Under Review

**1.** *Pub. Serv. Comm'n of West Virginia v. PJM Interconnection, L.L.C.*, Order Denying Complaints, 186 FERC ¶ 61,163 (Mar. 1, 2024) (Complaint Order), R. 90, JA___-___; and,

**2.** *Pub. Serv. Comm'n of West Virginia v. PJM Interconnection, L.L.C.*, Notice of Denial of Rehearing by Operation of Law, 187 FERC ¶ 62,070 (Apr. 29, 2024), R. 92, JA___.

### C.    Related Cases

This case has not previously been before this Court or any other court.  Counsel is not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney

# <u>TABLE OF CONTENTS</u>

Introduction and Statement of Issues ................................................. 1

Counterstatement on Jurisdiction...................................................... 3

Statutory and Regulatory Provisions .................................................. 4

Statement of Facts............................................................................4

I.    Statutory and Regulatory Background.....................................  4

    A.    Federal Power Act ............................................................... 4

    B.    Regional Transmission Organizations .............................. 6

    C.    PJM Interconnection and Its Market Monitor.................. 7

    D.    Stakeholder Access to the PJM Board ............................. 8

II.   The Complaint Order on Review ............................................. 13

    A.    The Market Monitor Complaint Proceeding.................... 13

    B.    The Commission Denies Relief ....................................... 14

Summary of Argument...................................................................... 16

Argument.........................................................................................18

I.    The Market Monitor Has Failed to Establish Standing .......... 18

    A.    The Market Monitor's Duties Are Not Meaningfully
           Impaired by FERC's Action Here .................................... 19

    B.    The Market Monitor Has No Cognizable, Legally
           Protected Interest in Providing Real-Time Rebuttal
           Regarding Its Own Performance ..................................... 23

II.    Standard of Review ................................................... 25

III.   Assuming Jurisdiction, The Commission Reasonably Denied
       the Market Monitor's Complaint ............................... 27

       A.    The Commission Reasonably Applied PJM's Tariff to
             the Facts of the Liaison Committee................................ 27

       B.    The Market Monitor's Contrary Arguments Are
             Unavailing........................................................ 30

Conclusion ........................................................ 32

# TABLE OF AUTHORITIES

## COURT CASES:

*Atl. City Elec. Co. v. FERC*,
   295 F.3d 1 (D.C. Cir. 2002) .................................................. 27-28

*Brady v. FERC*,
   416 F.3d 1 (D.C. Cir. 2005) .................................................. 26-27

*Cal. ex rel. Lockyer v. Dynegy, Inc.*,
   375 F.3d 831 (9th Cir. 2004) ..................................................... 20

*City of Lincoln v. FERC*,
   89 F.4th 926 (D.C. Cir. 2024)...............................................25, 26

*Columbia Gas Transmission Corp. v. FPC*,
   530 F.2d 1056 (D.C. Cir. 1976)................................................... 26

*Ctr. for Law & Educ. v. Dep't of Educ.*,
   396 F.3d 1152 (D.C. Cir. 2005)............................................18, 22

*Entergy Servs., Inc. v. FERC*,
   375 F.3d 1204 (D.C. Cir. 2004)................................................. 5-6

*Facebook, Inc. v. Duguid*,
   592 U.S. 395 (2021) ................................................................. 27

*FERC v. Elec. Power Supply Ass'n*,
   577 U.S. 260 (2016) ......................................................... 4-5, 25

*FirstEnergy Serv. Co. v. FERC*,
   758 F.3d 346 (D.C. Cir. 2014)............................................. 5, 31

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015)................................................... 22

*Kansas Cities v. FERC,*
    723 F.2d 82 (D.C. Cir. 1983) ................................................... 26

*La. Energy & Power Auth. v. FERC,*
    141 F.3d 364 (D.C. Cir. 1998)................................................... 18

*La. Pub. Serv. Comm'n v. FERC,*
    522 F.3d 378 (D.C. Cir. 2008)................................................... 26

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..................................................... 18

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1,*
    554 U.S. 527 (2008) ..................................................... 6

*Nat'l Fuel Gas Supply Corp. v. FERC,*
    811 F.2d 1563 (D.C. Cir. 1987)................................................. 26

*New England Power Generators Assoc. v. FERC,*
    879 F.3d 1192 (D.C. Cir. 2018)................................................. 31

*New York v. FERC,*
    535 U.S. 1 (2002) ..................................................... 6

*New York Reg'l Interconnect, Inc. v. FERC,*
    634 F.3d 581 (D.C. Cir. 2011)................................................... 4

*NRG Power Mktg., LLC v. Maine Pub. Utils. Comm'n,*
    558 U.S. 165 (2010) ............................................... 6-7

*Old Dominion Elec. Coop. v. FERC,*
    892 F.3d 1223 (D.C. Cir. 2018)............................. 4, 18-19, 24-25

*People for the Ethical Treatment of Animals v. Dep't of Agric.,*
    797 F.3d 1087 (D.C. Cir. 2015)....................................... 19-20, 22

*PJM Power Providers Grp. v. FERC,*
    88 F.4th 250 (3d Cir. 2023) ..................................................... 7

v

*Potomac Elec. Power Co. v. FERC,*
        210 F.3d 403 (D.C. Cir. 2000)..................................................... 31

*Summers v. Earth Island Inst.,*
        555 U.S. 488 (2009) ...........................................................20, 24

*Turlock Irr. District v. FERC,*
        786 F.3d 18 (D.C. Cir. 2015) ...............................................18, 22

*TransUnion LLC v. Ramirez,*
        594 U.S. 413 (2021) ................................................................ 20

*W. Deptford Energy, LLC v. FERC,*
        766 F.3d 10 (D.C. Cir. 2014) .................................................... 5

## ADMINISTRATIVE CASES:

*PJM Interconnection, L.L.C.,*
        133 FERC ¶ 61,071 (2010) ...................................................... 11

*PJM Interconnection, L.L.C.,*
        144 FERC ¶ 61,238 (2013) ........................................................ 8

*PJM Interconnection, L.L.C.,*
        167 FERC ¶ 61,084, *reh'g denied,*
        168 FERC ¶ 61,141 (2019) ........................................................ 5

*Pub. Serv. Comm'n of West Va. v. PJM Interconnection, L.L.C.,*
        186 FERC ¶ 61,163 (2024) ..........................2, 7-16, 21, 23, 27-31

## STATUTES:

Administrative Procedure Act
        5 U.S.C. § 706(2)(A).................................................................. 25

Federal Power Act
        Section 201, 16 U.S.C. § 824 .................................................... 4

Section 205, 16 U.S.C. § 824d ...................................................... 5

Section 206, 16 U.S.C. § 824e ........................................5, 29, 31

Section 306, 16 U.S.C. § 825e ...................................................... 5

Section 313, 16 U.S.C. § 825*l* ............................................... 4, 26

**REGULATIONS:**

18 C.F.R. § 35.28(g)(6)............................................................. 8-9

# GLOSSARY

| | |
|---|---|
| Br. | Opening brief of Petitioner Independent Market Monitor for PJM |
| Commission or FERC | Federal Energy Regulatory Commission |
| Complaint Order | *Pub. Serv. Comm'n of West Va. v. PJM Interconnection, L.L.C.*, Order Denying Complaints, 186 FERC ¶ 61,163 (Mar. 1, 2024), R. 90, JA___-___ |
| Liaison Committee | An avenue for communication between PJM Members, through their elected sector representatives, and the PJM Board |
| Market Monitor | Petitioner Monitoring Analytics, LLC, also known as the Independent Market Monitor for PJM |
| PJM | Intervenor for Respondent PJM Interconnection, L.L.C. |
| PJM Board | The Board of Managers of PJM |
| PJM Tariff or Tariff | The Commission-jurisdictional PJM Open Access Transmission Tariff, specifically Attachment M thereto |
| Services Agreement | The services contract between PJM and its Market Monitor, filed with the Commission as PJM Rate Schedule No. 46, Market Monitoring Services Agreement |

# In the United States Court of Appeals for the District of Columbia Circuit

### No. 24-1164
_____

INDEPENDENT MARKET MONITOR FOR PJM,
*Petitioner*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.
_____

ON PETITION FOR REVIEW OF AN ORDER OF THE
FEDERAL ENERGY REGULATORY COMMISSION
_____

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION
_____

## INTRODUCTION AND STATEMENT OF ISSUES

This case arises out of an intramural dispute about access to meetings held at PJM Interconnection, L.L.C. (PJM), a regional electric grid and market operator regulated by Respondent Federal Energy Regulatory Commission (FERC or Commission).

In 2023, the Independent Market Monitor for PJM (Market Monitor) complained to FERC that the organization it works for—Intervenor for Respondent PJM—refused to allow the Market Monitor

to attend a certain set of PJM meetings known as the Liaison Committee. While PJM's FERC-approved tariff allows the Market Monitor to attend "stakeholder processes," PJM argued that meetings of the Liaison Committee are not part of the stakeholder processes referred to in that tariff provision. PJM noted that the Liaison Committee has no authority to vote on or decide any PJM-related matters. In the order on review, FERC agreed with PJM and denied the administrative complaint. *Pub. Serv. Comm'n of West Va. v. PJM Interconnection, L.L.C.*, Order Denying Complaints, 186 FERC ¶ 61,163, at PP 48-50, 85-86 (Mar. 1, 2024) (Complaint Order), R. 90, JA___-___, ___-___.

On review, the Market Monitor contends that PJM has not abided by the cited tariff provision, and that the Commission misapplied the tariff in denying its complaint. But since the Market Monitor has ample access to information and meetings at PJM aside from the Liaison Committee, the Commission moved to dismiss this appeal for lack of a cognizable injury supporting Article III standing. This Court referred that motion to the merits panel, and the Commission renews its arguments here. But, should the Court reach the merits, the

Complaint Order explained why the Market Monitor failed to carry its statutory burden as the complainant here.  The Market Monitor did not allege any facts or offer any evidence indicating that the Liaison Committee makes decisions such that it properly should be considered part of PJM's stakeholder process under the tariff.

*The issues presented for review are:*

1.  Whether the petition for review should be dismissed for lack of Article III standing, given that the Market Monitor already has ample access to the PJM Board, and that its exclusion from the meetings of one committee (the Liaison Committee) does not meaningfully impair the Market Monitor's ability to make and communicate informed judgments about market operations.

2.  Assuming appellate jurisdiction, whether the Commission reasonably denied the Market Monitor's complaint after interpreting the cited tariff provision and finding that it does not apply to the Liaison Committee's meetings.

## COUNTERSTATEMENT ON JURISDICTION

To obtain judicial review of Commission orders, a petitioner must satisfy the requirements of both Article III of the United States

3

Constitution and section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b). *See N.Y. Reg'l Interconnect, Inc. v. FERC*, 634 F.3d 581, 586-87 (D.C. Cir. 2011); *see also Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1232-34 (D.C. Cir. 2018) (denying intervenor status to Market Monitor because it had "no legally cognizable interest" at stake). As noted, the Commission moved to dismiss this appeal on July 8, 2024. *See* Motion to Dismiss, ECF No. 2063310, *referred to merits panel by* Order, Sept. 4, 2024 (ECF No. 2073040). As discussed in Argument section I, the petition for review here should be dismissed for lack of standing under Article III.

## STATUTORY AND REGULATORY PROVISIONS

The pertinent provisions are contained in the Addendum to this brief.

## STATEMENT OF FACTS

## I.   STATUTORY AND REGULATORY BACKGROUND

### A.   Federal Power Act

Section 201 of the Federal Power Act, 16 U.S.C. § 824, gives the Commission exclusive jurisdiction over the rates, terms, and conditions of service for the transmission and sale at wholesale of electric energy in interstate commerce. *See FERC v. Elec. Power Supply Ass'n*,

4

577 U.S. 260, 264-66 (2016).  To facilitate transparency and Commission oversight, each regulated utility must "file with the Commission" its rates in a publicly available document called a tariff. 16 U.S.C. § 824d(c).  Utilities must abide by those tariffs and may not deviate from their terms and conditions of service without Commission approval.  *See W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 12-13 (D.C. Cir. 2014).

Sections 206 and 306 of the Act authorize the Commission to investigate existing utility rates and practices upon complaint. 16 U.S.C. §§ 824e(a), 825e.[1]  Under section 206, the complaining party bears the burden of establishing that the challenged utility practice is unlawful.  *Id.* § 824e(b); *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 353 (D.C. Cir. 2014).  Where that burden is carried, leading the Commission to find that the complained-of utility practice violates the utility's tariff, the Commission may direct the utility to cease the

---

[1] *See also PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,084, at PP 70-76 (finding that the Market Monitor could initiate an administrative complaint proceeding against PJM), *reh'g denied*, 168 FERC ¶ 61,141, at PP 10-15 (2019).

violation and conform its practices to the tariff. *See Entergy Servs., Inc. v. FERC*, 375 F.3d 1204, 1208 (D.C. Cir. 2004).

## B.    Regional Transmission Organizations

Historically, electric utilities were vertically integrated monopolies that owned electric generating facilities, transmission lines and distribution systems, and sold all of these services as a "bundled" package to their customers. *New York v. FERC*, 535 U.S. 1, 5 (2002). Since then, however, jurisdictional public utilities have been required to announce separate rates for their Commission-jurisdictional services and offer nondiscriminatory open-access transmission service to customers. *See id.* at 7-12, 14-17.

To reduce the technical inefficiencies associated with different utilities operating different parts of the grid, the Commission encouraged utilities to establish "Regional Transmission Organizations" or "Independent System Operators," which today have operational control over the transmission facilities owned by multiple utilities and operate a variety of electric markets. *See Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 536-37 (2008). In other words, a grid operator is "an independent company that has operational

6

control, but not ownership, of the transmission facilities owned by member utilities." *NRG Power Mktg., LLC v. Maine Pub. Utils. Comm'n*, 558 U.S. 165, 169 n.1 (2010).

### C.    PJM Interconnection and its Market Monitor

PJM Interconnection, L.L.C. is an electric grid and market operator that manages a system serving approximately fifty million consumers in thirteen states and the District of Columbia. *PJM Power Providers Grp. v. FERC*, 88 F.4th 250, 261 (3d Cir. 2023).  PJM stands for Pennsylvania, New Jersey, and Maryland—the first three states in which it operated. *See FERC Energy Primer: A Handbook for Energy Market Basics* at 83 (Dec. 2023), *available at* https://perma.cc/Q4ZZ-7WR7.  PJM is governed by a Board of Managers (the PJM Board), most of whom are elected by PJM's Members—a diverse group that includes market participants, utilities, and customers. *See id.*; Complaint Order P 2 & n.5, JA___.

Pursuant to FERC requirements for market operators, PJM has a market monitoring plan set forth in its Commission-jurisdictional tariff. That plan, located at Attachment M to the PJM Open Access Transmission Tariff (PJM Tariff or Tariff), calls for PJM to obtain the

services of an independent market monitor.  Complaint Order P 7 (describing market monitoring activities), JA___-___.  PJM has chosen to engage the Market Monitor—whose business name is Monitoring Analytics, LLC—as an independent contractor who reports directly to the PJM Board.  *See PJM Interconnection, L.L.C.*, 144 FERC ¶ 61,238, at PP 1-3 (2013).  Pursuant to its services agreement, the Market Monitor "is an independent contractor and not an employee of PJM or any of its subsidiaries or affiliates."  PJM Rate Schedule No. 46, Market Monitoring Services Agreement (Services Agreement), section 13 (Independent Contractor) (2.0.0), Add. A-18.[2]

## D.    Stakeholder Access to the PJM Board

As a regional transmission organization, PJM is expected to be responsive to the views of electric customers and others with an interest in PJM's markets (often referred to as stakeholders).  *See* Complaint

---

[2] PJM recently decided to extend the Market Monitor's contract for an additional six years.  *See* PJM Transmittal Letter at 3, Docket No. ER25-807-000 (filed Dec. 26, 2024) (proposing to extend term of the agreement "to December 31, 2031").  Noting the lack of protests or adverse comments, the Commission accepted that uncontested filing. *PJM Interconnection, L.L.C.*, Delegated Letter Order (issued Feb. 11, 2025) (FERC Docket No. ER25-807-000).  *Available at* https://elibrary.ferc.gov/eLibrary/docketsheet?docket_number=ER25-807&sub_docket=All.

Order PP 6, 81 (citing, in part, 18 C.F.R. § 35.28(g)(6)(i), Add. A-12), JA___-___, ___.  Thus, Commission policy requires that stakeholders have access to the PJM Board to share their views, and further requires that PJM's decision-making consider and balance the interests of its customers and stakeholders.  *Id.* PP 6, 80, JA___, ___.

To comply with these requirements, PJM has devised an entire organizational apparatus for stakeholder engagement and feedback regarding PJM decisions.  This "stakeholder process" is, in effect, a somewhat hierarchical structure of various stakeholder committees and groups that meet to consider all manner of PJM ideas and proposals.  PJM illustrates the high-level structure of its stakeholder process as indicated in the below diagram.

PJM Manual 34 at 26 (Exhibit 1), Pet. Add. 56.[3]

But, importantly, the Commission does not require that PJM open up every possible meeting with the PJM Board to all interested attendees. *See* Complaint Order PP 80-82, JA___-___. As the Commission explained, its "Order No. 719 does not require PJM to allow every stakeholder to attend any meeting between another group

---

[3] The opening brief's addendum includes a more recent version of this Manual, which is materially similar to the version cited by the Commission, though with different pagination. The earlier Jan. 25, 2023 version is available at https://perma.cc/5XCF-UVBQ. This graphic appears at Section 5.1, Overview and Standing Committees in both versions.

of stakeholders and the PJM Board." *Id.* P 82, JA___.[4]  Stakeholders must have the opportunity to communicate their views to the Board— i.e., must have "access to" Board members—but Commission policy does not require "that every party must be included in every meeting between the Board and other parties." *Id.* P 80, JA___.

Pursuant to these policies, some groups may meet with the PJM Board privately, which allows for clear lines of communication, sometimes about confidential subjects.  *See id.* PP 81-82, JA___. In practice, there are at least three sets of closed meetings that certain groups or entities individually have on a recurring basis with the PJM Board.  The Market Monitor itself has such meetings, *id.* P 86 & n.202, JA___-___, relevant state public utility commissions have such meetings through a membership organization, *id.* P 82, JA___, and PJM Members have one as well, called the Liaison Committee, *see id.* PP 2 & n.5, 74, 77 (describing PJM's membership and the Committee), JA___, ___, ___.

---

[4] *See also PJM Interconnection, L.L.C.*, 133 FERC ¶ 61,071, at P 41 (2010) (Order No. 719 Compliance Order) (finding that PJM's "governance procedures and stakeholder processes are sufficient to ensure that the views of all customers and other stakeholders will be made known to the PJM Board" pursuant to Commission policy).

11

The Liaison Committee "provide[s] an avenue for communication between" representatives of PJM's diverse membership "and the PJM Board," but the Liaison Committee "does not make decisions." *Id.* PP 2, 79, JA___, ___. That is, no Member votes on market rule proposals are taken at Liaison Committee meetings. *Id.* PP 79 & n.175, 85 & n.201, JA___, ___. Rather, market rule proposal votes occur at a different set of meetings, outside the Liaison Committee, that are open to the Market Monitor. *See id.* PP 85 & n.201, 86 & n.204, JA___-___. The Members Committee and its subsidiary groups are where Members propose and debate market rule changes and ultimately cast votes on important PJM issues. *See* Br. 2, 18, 25; Bowring Decl. P 9, Pet. Add. 5; *see also* Diagram, *supra* p. 10.

In contrast, the Liaison Committee "has no authority to vote on or decide any matters, or to act as a substitute for the decision-making processes of the Members Committee." PJM Answer at 9-10, R. 77, JA___-___. The Liaison Committee is simply intended to ensure "exchanges and information sharing on topics of relevance to the Members and the Board," which happens to include "future market monitoring contracts." Complaint Order PP 2, 60, JA___, ___.

## II.    THE COMPLAINT ORDER ON REVIEW

### A.    The Market Monitor Complaint Proceeding

On March 24, 2023, the Market Monitor filed a complaint at the Commission against PJM.  Complaint Order P 1, JA___.  It claimed that PJM was violating Attachment M to the PJM Tariff by not allowing the Market Monitor to attend Liaison Committee meetings.  *Id.*  According to the Market Monitor, certain provisions of the PJM Tariff allow it to attend whatever stakeholder forum it finds "appropriate or necessary" to its functions.  *See id.* PP 18, 85, JA___, ___.[5]

And because the terms of the PJM Tariff trump the charter (i.e., the organizing document or bylaws) of the Liaison Committee, the Market Monitor contended that PJM violates its Tariff by allowing the Liaison Committee to remain a Members-only invitation.  *See id.* PP 63-

---

[5] Several weeks before the Market Monitor filed its Liaison Committee complaint, the Public Service Commission of West Virginia (West Virginia Commission) also filed a complaint seeking to be allowed to attend Liaison Committee meetings.  Complaint Order P 1 (referring to Commission Docket No. EL23-45-000), JA___.  Though sharing the same objective, the West Virginia Commission's claims relied on other Commission policies and standards, not the PJM Tariff provision at issue here that is specific to market monitoring activities.  *See id.*  The West Virginia Commission did not seek rehearing or judicial review of the Complaint Order and is not a party to this appeal.

64, 85, JA___, ___.

In short, the Market Monitor wanted to invite itself to other groups' closed meetings, despite not satisfying the stated criteria for participation in those meetings. PJM opposed the complaint, arguing that the Market Monitor's interests are limited to the monitoring services it provides, and that, in any event, the Market Monitor meets regularly with Board members regarding competitive market issues. *See* PJM Answer to Complaint at 2-4, 10-11, R. 77, JA___-___, ___-___. PJM further asserted that "the Liaison Committee is simply a communication vehicle and not a forum with voting rights to advance potential changes to any Governing Documents" such as the PJM Operating Agreement. *Id.* at 1, 4, JA___, ___; *see also* Bowring Decl. PP 9-10 (discussing stakeholder voting), Pet. Add. 5.

### B. The Commission Denies Relief

The Commission declined to order relief. Complaint Order PP 85-86, JA___-___. It found that the Liaison Committee did not come within the scope of the cited Tariff provision. *Id.* P 85, JA___-___. Although under the Tariff, the Market Monitor may "participate (consistent with the rules applicable to all PJM stakeholders) in stakeholder working

14

groups, committees or other PJM stakeholder processes," the Commission found that this provision speaks to stakeholder processes that the PJM Board uses to make decisions. *Id.* That is, this Tariff provision enables Market Monitor attendance when there are decision-oriented meetings on "proposed revisions to tariff provisions, governing documents, processes, or market design and operations." *Id.*, JA___.

The Liaison Committee, however, is not an element of the PJM Board's decision-making process. *See id.* Rather, the Commission found that the stated purpose of the Liaison Committee is "to facilitate communication" and to help "Members *understand* the PJM Board decision making process." *Id.* (emphasis in original). And the Commission found that the Market Monitor provided no evidence that "the Liaison Committee is *actually* being used as part of a decision-making process." *Id.* (emphasis in original).

Furthermore, the Commission noted that the Market Monitor has "ample opportunities" of its own "to meet with the PJM Board, both directly and indirectly." *Id.* P 86, JA___. Given all this, the Commission found that the Market Monitor did not satisfy its burden to prove that the Liaison Committee is a stakeholder working group,

15

committee or other PJM stakeholder process as contemplated by the

Tariff such that the complaint should be granted. *Id.* PP 85, 86, JA___,

___. One Commissioner dissented, emphasizing the special nature of

the Market Monitor and its important responsibilities. *See id.* PP 13-14

(Christie, dissenting), JA___-___.

The Market Monitor sought agency rehearing, renewing its Tariff-

based arguments. Reh'g Request at 1-4 (filed Mar. 29, 2024), R. 91,

JA___-___. The Commission issued a notice of denial of rehearing by

operation of law, and this appeal followed.

### SUMMARY OF ARGUMENT

The Market Monitor believes that it has been wrongly excluded

from a certain set of meetings at PJM. It believes that a Tariff

provision grants plenary discretion to the Market Monitor to attend

whatever stakeholder meetings it believes are appropriate or necessary.

And so it argues that the Commission failed to give that provision full

effect regarding the meetings of PJM's Liaison Committee.

Even if true, these allegations do not amount to a cognizable

injury to the Market Monitor that supports Article III standing to

maintain this appeal. As the Commission explained, the Market

16

Monitor has its own set of meetings with its employer, the PJM Board.
And the Market Monitor admits that it vigorously participates in the
meetings that comprise PJM's stakeholder process—the scores of
meetings and forums that exist at PJM to vet decisions on all manner of
market-related issues.  The Market Monitor offers nothing more than
abstract or generalized harm from not attending more meetings.

If the Court proceeds to the merits, it would see that the
Commission reasonably applied the cited tariff provision to the facts
presented by the Market Monitor.  The Commission found that the
Liaison Committee is not a part of the stakeholder process as it does not
make decisions.  The Market Monitor did not allege or provide evidence
to the Commission that the Liaison Committee is in fact being used as a
decisional forum.  On appeal here, the Market Monitor simply
reiterates its belief that the cited tariff provision was misapplied.
But the Market Monitor provides no basis, evidentiary or otherwise, to
conclude that the Commission misread the record or misunderstood the
tariff here.

## ARGUMENT

## I.  THE MARKET MONITOR HAS FAILED TO ESTABLISH ARTICLE III STANDING

This Court has repeatedly explained that to establish Article III standing, a petitioner "must have suffered injury in fact," which is "an actual or imminent invasion of a legally protected, concrete and particularized interest." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *see also Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 23 (D.C. Cir. 2015) (same).  Depending on the circumstances, a FERC-jurisdictional utility (or its customers or competitors) may be financially aggrieved by markets-related agency action under the Federal Power Act, and therefore possess Article III standing to seek judicial review.  *See*, *e.g.*, *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 366-67 (D.C. Cir. 1998) (finding that competitor and customer of utility had standing regarding rate dispute).

The Market Monitor, however, is an unusual type of entity. It neither charges nor pays rates subject to Commission jurisdiction; instead, its role "is much in the nature of an auditor" at PJM and so its legal interests are limited to its "contractually assigned tasks" such as

18

"observing the market's operations and then offering recommendations." *Old Dominion*, 892 F.3d at 1233. As this Court has explained, "the Monitor has no independent legal interest of its own in the PJM markets" and "is not a contractual party to . . . the Tariff." *Id.*

But, as the Market Monitor explains here, this case is not even about access to PJM's markets or their operation—it is about access to a particular set of *meetings* the Market Monitor desires to attend. Br. 2. The Market Monitor offers two main assertions in support of its standing here: 1) that access to Liaison Committee meetings is critical to carrying out the Market Monitor's market design functions; and 2) that the Market Monitor must be able to hear and respond in real time to other parties' concerns about its performance. *See* Br. 4-6, 13, 15-18. Neither assertion is persuasive.

### A.    The Market Monitor's Duties Are Not Meaningfully Impaired by FERC's Action Here

The Market Monitor first claims that its ability "to perform its organizational mission" is imperiled by not being able to attend Liaison Committee meetings. Br. 6-7. It acknowledges that under this Court's precedents, FERC's interference with the Market Monitor's interests must be more than just a "setback" to "abstract" concerns—the

19

interference must be a "drain on the organization's resources" that

denies access to "key information that it relies on to educate the public."

Br. 10-11 (quoting *People for the Ethical Treatment of Animals v. Dep't

of Agric.*, 797 F.3d 1087, 1093-94 (D.C. Cir. 2015)).[6]

But the Market Monitor has access to the PJM Board and to

market-related data. *See* Market Monitor Response to Motion to

Dismiss at 13 (admitting that these concerns are not at issue here),

ECF No. 2064654. It also has full access to PJM's decision-making

process—indeed, the Market Monitor identifies no fewer than 17

committees, task forces, and other PJM forums in which it is an active

participant on market and market-design issues, totaling more than

100 meetings attended in 2024 alone. Bowring Decl. PP 18-19, Pet.

---

[6] The Market Monitor also equates the Tariff provision to "a statutory right" of access to the meetings it would like to attend (Br. 7), a comparison that is inapt. *See Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th Cir. 2004) (equating filed tariffs with agency regulations instead). But regardless of the source of the claimed right, the Market Monitor must demonstrate how that right's denial inflicts concrete harm. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009) (finding alleged procedural deficiencies "insufficient to create Article III standing" where plaintiff is unable to identify "some concrete interest that is affected by the deprivation").

Add. 8.  And the Market Monitor possesses many of its own tools for obtaining further information and data (from PJM and from market participants) when necessary.  *See* PJM Tariff, Att. M, section V (Information and Data) (5.0.0), Add. A-15 to A-17; *see also* Complaint Order P 86 (describing the Market Monitor's routine interaction with stakeholders and the PJM Board), JA___-___.

Despite all this, the Market Monitor asks for more information. It argues that it must also attend Liaison Committee meetings because those meetings "create the opportunity for [PJM] Members to advocate proposed changes to the market design that may be inconsistent" with the Market Monitor's views.  Bowring Decl. P 14, Pet. Add. 6-7.  In effect, the Market Monitor believes that any time market design issues are up for discussion, on any PJM Board-sponsored meeting agenda, failing to include the Market Monitor necessarily results in a significant hindrance to the Market Monitor's abilities.  *See id.*; *see also* PJM Answer to Complaint at 11 ("the Complaint essentially asks . . . [for] permission to attend any PJM meeting, with no limiting principles"), R. 77, JA___.  This belief holds even where the Market Monitor

21

disclaims an interest in raising any agenda items of its own at such meetings.  *See* Bowring Decl. P 11, Pet. Add. 6.

Under this Court's standing precedents, the challenged agency conduct must have "perceptibly impaired" an organization's "ability to provide services" to amount to a cognizable injury in fact. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *Turlock*, 786 F.3d at 24).  In other words, there must be a "direct conflict between the defendant's conduct and the organization's mission" that amounts to actual impairment of the organization's activities.  *Dep't of Agriculture*, 797 F.3d at 1095 (citations omitted); *see also Turlock*, 786 F.3d at 24 (expending resources on litigation or administrative proceedings "does not qualify as an injury in fact" on its own).  That impairment simply has not occurred here, even if, as the Market Monitor (incorrectly) alleges, FERC inappropriately allowed Liaison Committee meetings to remain closed.  Generalized "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing."  *Ctr. for Law & Educ.*, 396 F.3d at 1161-62 (citation omitted).

### B.    The Market Monitor Has No Cognizable, Legally Protected Interest in Providing Real-Time Rebuttal Regarding Its Own Performance

The Market Monitor also contends that FERC's action "deprives the Market Monitor of notice and opportunity to be heard concerning complaints" to the PJM Board "about the Market Monitor's performance."  Br. 15.  This is a problem, the Market Monitor claims, because the PJM Board has the power to potentially terminate or replace the Market Monitor for performance reasons.  *Id.* 16.

However, the Market Monitor admits that the review of its performance by the PJM Board is governed by a separate contract—the Services Agreement.  *See id.* 16-17.  As previously explained, the Market Monitor has a direct line to the PJM Board, including to discuss market issues and organizational performance.  *See* Motion to Dismiss Reply at 2 (citing Complaint Order PP 85-86, JA___-___ and Services Agreement, section 28 (Communication and Cooperation) (0.0.0), Add. A-19), ECF No. 2065647.  By contract, market monitor performance meetings include written notification and subsequent discussion of any performance problems the PJM Board may identify. Services Agreement, section 27 (Adequate Performance Under

23

Attachment M) (2.0.0), Pet. Add. 183.  But the Market Monitor's claims do not even pertain to this contractual performance review process—the only issue it raises is that the *stakeholder* meeting provisions of a separate document (the Tariff) have allegedly not been enforced. *See* Br. 2, 3-4, 6; *see also* Reh'g Req. at 1-4 (same), JA___-___; Mot. to Dismiss Resp. at 13 (same); *Old Dominion*, 892 F.3d at 1233 (explaining that the Market "Monitor is not a contractual party to … the Tariff").

Thus, there is no allegation that the PJM Board has failed to communicate with the Market Monitor about performance issues.  And there is no claim here that the Board intends to take action against the Market Monitor due to Liaison Committee-related information.  Rather, all the Market Monitor alleges is that it has been a topic of discussion in closed meetings.  *See* Br. 18.  At most, the Market Monitor claims it should have been allowed to attend those meetings to hear what others are saying, but it fails to identify any concrete harm that has resulted from its non-attendance.  *See Summers*, 555 U.S. at 496-97 (requiring showing of harm stemming from alleged procedural violation).

Indeed, without any "law that vests it with independent legal rights," nor demonstration of a "significant and direct interest" that has

been invaded, *Old Dominion*, 892 F.3d at 1234, the Market Monitor here has failed to identify cognizable injury to a legally protected interest that provides it with Article III standing.[7]

## II.   STANDARD OF REVIEW

If the Court proceeds to the merits of this case, it should review the Commission's decisions here under the Administrative Procedure Act's narrow arbitrary and capricious standard. *See* 5 U.S.C. § 706(2)(A); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Under that standard, the question is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Elec. Power Supply Ass'n*, 577 U.S. at 292. Instead, courts will "uphold FERC's action so long as it examined relevant considerations and articulated a reasoned explanation for" its action. *City of Lincoln v. FERC*, 89 F.4th 926, 931 (D.C. Cir. 2024).

---

[7] To the extent the Market Monitor seeks to protect its interest in potential renewal of its contract with PJM, any such concern is now speculative or moot. PJM recently decided to extend the Market Monitor's contract for an additional six years to December 31, 2031, with no substantive change to performance-related provisions. *See* PJM Transmittal Letter at 2-3, 5, Docket No. ER25-807-000, *supra* note 2.

The Commission's interpretation of jurisdictional tariffs and contracts—like the PJM Tariff at issue here—is entitled to respect. In this context, and "even before *Chevron*," the Court has accorded "great weight to the judgment of the expert agency that deals with" industry-specific legal terms "on a daily basis." *Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1570-71 (D.C. Cir. 1987) (quoting, in part, *Kansas Cities v. FERC*, 723 F.2d 82, 87 (D.C. Cir. 1983)); *see also Columbia Gas Transmission Corp. v. FPC*, 530 F.2d 1056, 1059 (D.C. Cir. 1976) (acknowledging "room . . . for some deference to [agency] views even on matters of law like the meaning of contracts").

Also, the Commission's factual findings are conclusive if supported by substantial record evidence. *See* 16 U.S.C. § 825*l*(b). This means that to the extent that record evidence could support several possible conclusions, "it is the agency's choice that governs." *La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 395 (D.C. Cir. 2008) (citation omitted). The Court defers to the Commission's reading of its own precedent as well. *City of Lincoln*, 89 F.4th at 931.

Taken together, this means that "so long as FERC's decisions are not arbitrary or capricious, or lacking in substantial evidence," this

Court does not "alter the Commission's judgment." *Brady v. FERC*,

416 F.3d 1, 10-11 (D.C. Cir. 2005).

## III. ASSUMING JURISDICTION, THE COMMISSION REASONABLY DENIED THE MARKET MONITOR'S COMPLAINT

### A. The Commission Reasonably Applied PJM's Tariff to the Facts of the Liaison Committee

**1.** *Tariff Interpretation.* In the Complaint Order, the Commission

interpreted the following provision of the PJM Tariff:

> The Market Monitoring Unit may, as it deems appropriate or necessary to perform its functions under this Plan, participate (consistent with the rules applicable to all PJM stakeholders) in stakeholder working groups, committees or other PJM stakeholder processes.

Complaint Order P 85 (quoting PJM Tariff, Attachment M, section

IV.G, Add. A-14), JA___. The Commission determined that this

provision grants the Market Monitor access to PJM's stakeholder

committees and stakeholder processes. *See id.* This follows from the

repeated use of the word "stakeholder" and the structure of the sentence

as a whole. *Id.* n.196, JA___. And that is "the most natural reading of

[the] sentence" as well. *Facebook, Inc. v. Duguid*, 592 U.S. 395, 403

(2021). After all, "words grouped in a list should be given a related

meaning." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 12 (D.C. Cir. 2002)

27

(explaining and applying the interpretive principle of "*noscitur a sociis*" (citation omitted)).

**2.** *Tariff Application.* However, the Commission found that the Market Monitor had failed to establish that Liaison Committee meetings are encompassed within that Tariff provision. Complaint Order P 85, JA___. In the Commission's reading, "stakeholder processes" are "elements of a decision making process." *Id.* Not every possible meeting is an element of an identifiable decision-making process, and so the Commission understandably asked whether the Liaison Committee in particular serves a decisional function at PJM. *See id.*, JA___-___.

The Commission reasonably determined that it did not. The Liaison Committee, under its organizing document, "is not, on its face, an element of the decision making process regarding proposed revisions to tariff provisions, governing documents, processes, or market design and operations." *Id.* (citing Liaison Committee Charter at 1, JA___), JA___; *see also* PJM Answer to Complaint at 8 ("The Liaison Committee is not, and has never been, a stakeholder working group or committee as contemplated in Tariff, Attachment M."), JA___.

28

**3.** *Evidentiary Burden.* Furthermore, despite shouldering the statutory burden of proving that PJM's practices are unjust and unreasonable, *see* Complaint Order P 85 & n.194 (citing 16 U.S.C. § 824e(b)), JA___, the Market Monitor "made no allegations in its complaint that the Liaison Committee is involved in PJM decision making." *Id.*, JA___-___. Nor did it "allege, let alone provide evidence, that the Liaison Committee is *actually* being used as part of a decision-making process." *Id.* (emphasis in original), JA___. In fact, the Market Monitor has "ample opportunities to meet with the PJM Board, both directly and indirectly," including regarding key PJM decisions of concern. *Id.* P 86, JA___-___.

In sum, the Commission found that the Market Monitor had not satisfied its burden to show (1) specifically, that the Liaison Committee is, within the understanding of the Tariff, a stakeholder committee, or (2) generally, that PJM had acted unlawfully. *Id.* PP 85-86, JA___-___. The Commission therefore denied the Market Monitor's complaint. *Id.* P 86, JA___.

29

**B.    The Market Monitor's Contrary Arguments Are Unavailing**

The Market Monitor appears to agree with the upshot of the Commission's tariff interpretation here—that the tariff provision is "authorization for the Market [Monitor] to participate in all PJM stakeholder processes."  Br. 20-21, 24; *see also supra* p. 27 (citing Complaint Order P 85 & n.196, JA___).  But the Market Monitor contends that the concept of a "stakeholder process" is broader than the Commission allowed, and that it includes any meetings used for "the identification of *issues* and the review of *issues*" with stakeholders. Br. 22 (emphasis added).

In essence, what the Market Monitor challenges is the Commission's finding that the Liaison Committee is not part of PJM's stakeholder process because it does not make decisions.  *See* Complaint Order P 85, JA___; *see also id.* P 79 & nn.175, 178 (explaining the Liaison Committee's limitations), JA___-___.  But this factual finding was based on substantial evidence: it was based on Commission precedent about PJM, and PJM's own documents and statements, which identify decision-making as the point of the stakeholder process. *See id.* P 85 & nn.197, 198, 201 (collecting citations), JA___-___.

30

The stakeholder process is "used to identify, review, and make *decisions* regarding proposed revisions to PJM's governing documents" and other market concerns. *Id.* P 85 (emphasis added), JA___. The Liaison Committee, in contrast, can "only write reports" and "does not have the authority to vote on or to decide any matters or to act as a substitute for the normal stakeholder process." *Id.* n.201, JA___. It is more simply used "to facilitate communication" and promote PJM Member understanding. *Id.* P 85, JA___. Thus, the Commission sided with PJM, further explaining that "[t]he Market Monitor does not allege any facts which lead us to find otherwise." *Id.*

This case therefore presents the familiar circumstance where a complainant under Federal Power Act section 206(b), 16 U.S.C. § 824e(b), failed to carry its evidentiary burden. *See*, *e.g.*, *New England Power Generators Assoc. v. FERC*, 879 F.3d 1192, 1200, 1202 (D.C. Cir. 2018) (denying petition for review); *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 353-56, 357 (D.C. Cir. 2014) (same); *Potomac Elec. Power Co. v. FERC*, 210 F.3d 403, 405-06, 408-10, 411-12 (D.C. Cir. 2000) (same, given that complainant failed to offer evidence beyond speculation).

## CONCLUSION

For the foregoing reasons, the petition for review should be dismissed for lack of Article III standing.  If the Court proceeds to the merits of the petition, it should be denied.

Respectfully submitted,

David L. Morenoff
Acting General Counsel

Robert H. Solomon
Solicitor

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney

Federal Energy Regulatory Commission
Washington, D.C.  20426
Tel.: (202) 502-6413
Email: jason.perkins@ferc.gov

February 28, 2025

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,768 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolbook 14-point font using Microsoft Word.

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney

Federal Energy Regulatory Commission
Washington, D.C.  20426
Tel.: (202) 502-6413
Email: jason.perkins@ferc.gov

February 28, 2025

# ADDENDUM

# TABLE OF CONTENTS

**Statutes**

Administrative Procedure Act

  5 U.S.C. § 706(2)(A) ................................................................ A-1

Federal Power Act

  Section 201, 16 U.S.C. § 824.................................................... A-2

  Section 205, 16 U.S.C. § 824d................................................. A-4

  Section 206, 16 U.S.C. § 824e ................................................. A-6

  Section 306, 16 U.S.C. § 825e ................................................. A-9

  Section 313, 16 U.S.C. § 825*l*................................................. A-10

**Regulations**

  18 C.F.R. § 35.28(g)(6) (2023) ................................................ A-12

**Tariffs and Contracts**

PJM Open Access Transmission Tariff, Attachment M (5.0.0)

  Excerpts from Section III at (A)-(D), (I) ................................. A-13

  Excerpts from Section IV at (A)-(B), (G)-(H), and (J)............ A-14

  Section V (Information and Data) ......................................... A-15

PJM Rate Schedule No. 46, Market Monitoring Services Agreement

  Section 13 (Independent Contractor) (2.0.0) ......................... A-18

  Section 28 (Communication and Cooperation) (0.0.0) .......... A-19

erwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## §705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## §706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

**STATUTORY NOTES AND RELATED SUBSIDIARIES**

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

# CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

## §801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Rep-

SUBCHAPTER II—REGULATION OF ELEC-
TRIC UTILITY COMPANIES ENGAGED IN
INTERSTATE COMMERCE

## § 824. Declaration of policy; application of subchapter

### (a) Federal regulation of transmission and sale of electric energy

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

### (b) Use or sale of electric energy in interstate commerce

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

### (c) Electric energy in interstate commerce

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

### (d) "Sale of electric energy at wholesale" defined

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

### (e) "Public utility" defined

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f),[1] 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

### (f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

### (g) Books and records

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

(A) an electric utility company subject to its regulatory authority under State law,

(B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

(C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall—

(A) preempt applicable State law concerning the provision of records and other information; or

(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

---

[1] So in original. Section 824e of this title does not contain a subsec. (f).

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

(June 10, 1920, ch. 285, pt. II, § 201, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 847; amended Pub. L. 95–617, title II, § 204(b), Nov. 9, 1978, 92 Stat. 3140; Pub. L. 102–486, title VII, § 714, Oct. 24, 1992, 106 Stat. 2911; Pub. L. 109–58, title XII, §§ 1277(b)(1), 1291(c), 1295(a), Aug. 8, 2005, 119 Stat. 978, 985; Pub. L. 114–94, div. F, § 61003(b), Dec. 4, 2015, 129 Stat. 1778.)

### Editorial Notes

#### References in Text

The Rural Electrification Act of 1936, referred to in subsec. (f), is act May 20, 1936, ch. 432, 49 Stat. 1363, which is classified generally to chapter 31 (§ 901 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 901 of Title 7 and Tables.

The Public Utility Holding Company Act of 2005, referred to in subsec. (g)(5), is subtitle F of title XII of Pub. L. 109–58, Aug. 8, 2005, 119 Stat. 972, which is classified principally to part D (§ 16451 et seq.) of subchapter XII of chapter 149 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 15801 of Title 42 and Tables.

#### Amendments

2015—Subsec. (b)(2). Pub. L. 114–94, § 61003(b)(1), inserted "824o–1," after "824o," in two places.

Subsec. (e). Pub. L. 114–94, § 61003(b)(2), inserted "824o–1," after "824o,".

2005—Subsec. (b)(2). Pub. L. 109–58, § 1295(a)(1), substituted "Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title" for "The provisions of sections 824i, 824j, and 824k of this title" and "Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title" for "Compliance with any order of the Commission under the provisions of section 824i or 824j of this title".

Subsec. (e). Pub. L. 109–58, § 1295(a)(2), substituted "section 824e(e), 824e(f), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title" for "section 824i, 824j, or 824k of this title".

Subsec. (f). Pub. L. 109–58, § 1291(c), which directed amendment of subsec. (f) by substituting "political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year," for "political subdivision of a state,", was executed by making the substitution for "political subdivision of a State," to reflect the probable intent of Congress.

Subsec. (g)(5). Pub. L. 109–58, § 1277(b)(1), substituted "2005" for "1935".

1992—Subsec. (g). Pub. L. 102–486 added subsec. (g).

1978—Subsec. (b). Pub. L. 95–617, § 204(b)(1), designated existing provisions as par. (1), inserted "except as provided in paragraph (2)" after "in interstate commerce, but", and added par. (2).

Subsec. (e). Pub. L. 95–617, § 204(b)(2), inserted "(other than facilities subject to such jurisdiction solely by reason of section 824i, 824j, or 824k of this title)" after "under this subchapter".

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2005 Amendment

Amendment by section 1277(b)(1) of Pub. L. 109–58 effective 6 months after Aug. 8, 2005, with provisions relating to effect of compliance with certain regulations approved and made effective prior to such date, see section 1274 of Pub. L. 109–58, set out as an Effective Date note under section 16451 of Title 42, The Public Health and Welfare.

#### State Authorities; Construction

Nothing in amendment by Pub. L. 102–486 to be construed as affecting or intending to affect, or in any way to interfere with, authority of any State or local government relating to environmental protection or siting of facilities, see section 731 of Pub. L. 102–486, set out as a note under section 796 of this title.

#### Prior Actions; Effect on Other Authorities

Pub. L. 95–617, title II, § 214, Nov. 9, 1978, 92 Stat. 3149, provided that:

"(a) Prior Actions.—No provision of this title [enacting sections 823a, 824i to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall apply to, or affect, any action taken by the Commission [Federal Energy Regulatory Commission] before the date of the enactment of this Act [Nov. 9, 1978].

"(b) Other Authorities.—No provision of this title [enacting sections 823a, 824i to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall limit, impair or otherwise affect any authority of the Commission or any other agency or instrumentality of the United States under any other provision of law except as specifically provided in this title."

## § 824a. Interconnection and coordination of facilities; emergencies; transmission to foreign countries

### (a) Regional districts; establishment; notice to State commissions

For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest. Each such district shall embrace an area which, in the judgment of the Commission, can economically be served by such interconnection and coordinated electric facilities. It shall be the duty of the Commission to promote and encourage such interconnection and coordination within each such district and between such districts. Before establishing any such district and fixing or modifying the boundaries thereof the Commission shall give notice to the State commission of each State situated wholly or in part within such district, and shall afford each such State commission reasonable opportunity to present its views and recommendations, and shall receive and consider such views and recommendations.

A – 3

indorser, surety, or otherwise in respect of any security of another person, unless and until, and then only to the extent that, upon application by the public utility, the Commission by order authorizes such issue or assumption of liability. The Commission shall make such order only if it finds that such issue or assumption (a) is for some lawful object, within the corporate purposes of the applicant and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the applicant of service as a public utility and which will not impair its ability to perform that service, and (b) is reasonably necessary or appropriate for such purposes. The provisions of this section shall be effective six months after August 26, 1935.

**(b) Application approval or modification; supplemental orders**

The Commission, after opportunity for hearing, may grant any application under this section in whole or in part, and with such modifications and upon such terms and conditions as it may find necessary or appropriate, and may from time to time, after opportunity for hearing and for good cause shown, make such supplemental orders in the premises as it may find necessary or appropriate, and may by any such supplemental order modify the provisions of any previous order as to the particular purposes, uses, and extent to which, or the conditions under which, any security so theretofore authorized or the proceeds thereof may be applied, subject always to the requirements of subsection (a) of this section.

**(c) Compliance with order of Commission**

No public utility shall, without the consent of the Commission, apply any security or any proceeds thereof to any purpose not specified in the Commission's order, or supplemental order, or to any purpose in excess of the amount allowed for such purpose in such order, or otherwise in contravention of such order.

**(d) Authorization of capitalization not to exceed amount paid**

The Commission shall not authorize the capitalization of the right to be a corporation or of any franchise, permit, or contract for consolidation, merger, or lease in excess of the amount (exclusive of any tax or annual charge) actually paid as the consideration for such right, franchise, permit, or contract.

**(e) Notes or drafts maturing less than one year after issuance**

Subsection (a) shall not apply to the issue or renewal of, or assumption of liability on, a note or draft maturing not more than one year after the date of such issue, renewal, or assumption of liability, and aggregating (together with all other then outstanding notes and drafts of a maturity of one year or less on which such public utility is primarily or secondarily liable) not more than 5 per centum of the par value of the other securities of the public utility then outstanding. In the case of securities having no par value, the par value for the purpose of this subsection shall be the fair market value as of the date of issue. Within ten days after any such

issue, renewal, or assumption of liability, the public utility shall file with the Commission a certificate of notification, in such form as may be prescribed by the Commission, setting forth such matters as the Commission shall by regulation require.

**(f) Public utility securities regulated by State not affected**

The provisions of this section shall not extend to a public utility organized and operating in a State under the laws of which its security issues are regulated by a State commission.

**(g) Guarantee or obligation on part of United States**

Nothing in this section shall be construed to imply any guarantee or obligation on the part of the United States in respect of any securities to which the provisions of this section relate.

**(h) Filing duplicate reports with the Securities and Exchange Commission**

Any public utility whose security issues are approved by the Commission under this section may file with the Securities and Exchange Commission duplicate copies of reports filed with the Federal Power Commission in lieu of the reports, information, and documents required under sections 77g, 78l, and 78m of title 15.

(June 10, 1920, ch. 285, pt. II, §204, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 850.)

### Executive Documents

#### Transfer of Functions

Executive and administrative functions of Securities and Exchange Commission, with certain exceptions, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out in the Appendix to Title 5, Government Organization and Employees.

### § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

**(a) Just and reasonable rates**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b) Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall

file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its deci-

sion shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the

change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

(A) the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a) of this title; and

(B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person seeks a rehearing under section 825*l*(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825*l*(b) of this title.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142; Pub. L. 115–270, title III, § 3006, Oct. 23, 2018, 132 Stat. 3868.)

**Editorial Notes**

AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).
1978—Subsec. (d). Pub. L. 95–617, § 207(a), substituted "sixty" for "thirty" in two places.
Subsec. (f). Pub. L. 95–617, § 208, added subsec. (f).

**Statutory Notes and Related Subsidiaries**

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

## § 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

**(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission

may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by

Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

(June 10, 1920, ch. 285, pt. II, §206, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 852; amended Pub. L. 100–473, §2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

**Editorial Notes**

REFERENCES IN TEXT

The Public Utility Holding Company Act of 1935, referred to in subsec. (c), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, which was classified generally to chapter 2C (§79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, §1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, §1295(b)(1), substituted "hearing held" for "hearing had" in first sentence.

Subsec. (b). Pub. L. 109–58, §1295(b)(2), struck out "the public utility to make" before "refunds of any amounts paid" in seventh sentence.

Pub. L. 109–58, §1285, in second sentence, substituted "the date of the filing of such complaint nor later than 5 months after the filing of such complaint" for "the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period", in third sentence, substituted "the date of the publication" for "the date 60 days after the publication" and "5 months after the publication date" for "5 months after the expiration of such 60-day period", and in fifth sentence, substituted "If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision" for "If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commis-

[1] See References in Text note below.

A - 7

sion shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision''.

Subsec. (e). Pub. L. 109–58, §1286, added subsec. (e).

1988—Subsec. (a). Pub. L. 100–473, §2(1), inserted provisions for a statement of reasons for listed changes, hearings, and specification of issues.

Subsecs. (b) to (d). Pub. L. 100–473, §2(2), added subsecs. (b) and (c) and redesignated former subsec. (b) as (d).

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

##### EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–473, §4, Oct. 6, 1988, 102 Stat. 2300, provided that: ''The amendments made by this Act [amending this section] are not applicable to complaints filed or motions initiated before the date of enactment of this Act [Oct. 6, 1988] pursuant to section 206 of the Federal Power Act [this section]: *Provided, however*, That such complaints may be withdrawn and refiled without prejudice.''

##### LIMITATION ON AUTHORITY PROVIDED

Pub. L. 100–473, §3, Oct. 6, 1988, 102 Stat. 2300, provided that: ''Nothing in subsection (c) of section 206 of the Federal Power Act, as amended (16 U.S.C. 824e(c)) shall be interpreted to confer upon the Federal Energy Regulatory Commission any authority not granted to it elsewhere in such Act [16 U.S.C. 791a et seq.] to issue an order that (1) requires a decrease in system production or transmission costs to be paid by one or more electric utility companies of a registered holding company; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company. For purposes of this section, the terms 'electric utility companies' and 'registered holding company' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C. 79 et seq.].''

##### STUDY

Pub. L. 100–473, §5, Oct. 6, 1988, 102 Stat. 2301, directed that, no earlier than three years and no later than four years after Oct. 6, 1988, Federal Energy Regulatory Commission perform a study of effect of amendments to this section, analyzing (1) impact, if any, of such amendments on cost of capital paid by public utilities, (2) any change in average time taken to resolve proceedings under this section, and (3) such other matters as Commission may deem appropriate in public interest, with study to be sent to Committee on Energy and Natural Resources of Senate and Committee on Energy and Commerce of House of Representatives.

### § 824f. Ordering furnishing of adequate service

Whenever the Commission, upon complaint of a State commission, after notice to each State commission and public utility affected and after opportunity for hearing, shall find that any interstate service of any public utility is inadequate or insufficient, the Commission shall determine the proper, adequate, or sufficient service to be furnished, and shall fix the same by its order, rule, or regulation: *Provided*, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel the public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers.

(June 10, 1920, ch. 285, pt. II, §207, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

### § 824g. Ascertainment of cost of property and depreciation

#### (a) Investigation of property costs

The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property.

#### (b) Request for inventory and cost statements

Every public utility upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 10, 1920, ch. 285, pt. II, §208, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

### § 824h. References to State boards by Commission

#### (a) Composition of boards; force and effect of proceedings

The Commission may refer any matter arising in the administration of this subchapter to a board to be composed of a member or members, as determined by the Commission, from the State or each of the States affected or to be affected by such matter. Any such board shall be vested with the same power and be subject to the same duties and liabilities as in the case of a member of the Commission when designated by the Commission to hold any hearings. The action of such board shall have such force and effect and its proceedings shall be conducted in such manner as the Commission shall by regulations prescribe. The board shall be appointed by the Commission from persons nominated by the State commission of each State affected or by the Governor of such State if there is no State commission. Each State affected shall be entitled to the same number of representatives on the board unless the nominating power of such State waives such right. The Commission shall have discretion to reject the nominee from any State, but shall thereupon invite a new nomination from that State. The members of a board shall receive such allowances for expenses as the Commission shall provide. The Commission may, when in its discretion sufficient reason exists therefor, revoke any reference to such a board.

#### (b) Cooperation with State commissions

The Commission may confer with any State commission regarding the relationship between rate structures, costs, accounts, charges, practices, classifications, and regulations of public utilities subject to the jurisdiction of such State commission and of the Commission; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

pany, or any other organization primarily engaged in the business of providing financial services or credit, a mutual savings bank, or a savings and loan association;

(B) any company, firm, or organization which is authorized by law to underwrite or participate in the marketing of securities of a public utility;

(C) any company, firm, or organization which produces or supplies electrical equipment or coal, natural gas, oil, nuclear fuel, or other fuel, for the use of any public utility;

(D) any company, firm, or organization which during any one of the 3 calendar years immediately preceding the filing date was one of the 20 purchasers of electric energy which purchased (for purposes other than for resale) one of the 20 largest annual amounts of electric energy sold by such public utility (or by any public utility which is part of the same holding company system) during any one of such three calendar years;

(E) any entity referred to in subsection (b); and

(F) any company, firm, or organization which is controlled by any company, firm, or organization referred to in this paragraph.

On or before January 31 of each calendar year, each public utility shall publish a list, pursuant to rules prescribed by the Commission, of the purchasers to which subparagraph (D) applies, for purposes of any filing under paragraph (1) of such calendar year.

(3) For purposes of this subsection—

(A) The term "public utility" includes any company which is a part of a holding company system which includes a registered holding company, unless no company in such system is an electric utility.

(B) The terms "holding company", "registered holding company", and "holding company system" have the same meaning as when used in the Public Utility Holding Company Act of 1935.[1]

(June 10, 1920, ch. 285, pt. III, § 305, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 856; amended Pub. L. 95–617, title II, § 211(a), Nov. 9, 1978, 92 Stat. 3147; Pub. L. 106–102, title VII, § 737, Nov. 12, 1999, 113 Stat. 1479.)

### Editorial Notes

#### References in Text

The Public Utility Holding Company Act of 1935, referred to in subsec. (c)(3)(B), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, which was classified generally to chapter 2C (§ 79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, § 1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

#### Amendments

1999—Subsec. (b). Pub. L. 106–102 inserted subsec. heading, designated existing provisions as par. (1), inserted heading, and substituted "After 6" for "After six", and added par. (2).

1978—Subsec. (c). Pub. L. 95–617 added subsec. (c).

---
[1] See References in Text note below.

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1978 Amendment

Pub. L. 95–617, title II, § 211(b), Nov. 9, 1978, 92 Stat. 3147, provided that: "No person shall be required to file a statement under section 305(c)(1) of the Federal Power Act [subsec. (c)(1) of this section] before April 30 of the second calendar year which begins after the date of the enactment of this Act [Nov. 9, 1978] and no public utility shall be required to publish a list under section 305(c)(2) of such Act [subsec. (c)(2) of this section] before January 31 of such second calendar year."

## § 825e. Complaints

Any person, electric utility, State, municipality, or State commission complaining of anything done or omitted to be done by any licensee, transmitting utility, or public utility in contravention of the provisions of this chapter may apply to the Commission by petition which shall briefly state the facts, whereupon a statement of the complaint thus made shall be forwarded by the Commission to such licensee, transmitting utility, or public utility, who shall be called upon to satisfy the complaint or to answer the same in writing within a reasonable time to be specified by the Commission. If such licensee, transmitting utility, or public utility shall not satisfy the complaint within the time specified or there shall appear to be any reasonable ground for investigating such complaint, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall find proper.

(June 10, 1920, ch. 285, pt. III, § 306, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 856; amended Pub. L. 109–58, title XII, § 1284(a), Aug. 8, 2005, 119 Stat. 980.)

### Editorial Notes

#### Amendments

2005—Pub. L. 109–58 inserted "electric utility," after "Any person," and ", transmitting utility," after "licensee" wherever appearing.

## § 825f. Investigations by Commission

### (a) Scope

The Commission may investigate any facts, conditions, practices, or matters which it may find necessary or proper in order to determine whether any person, electric utility, transmitting utility, or other entity has violated or is about to violate any provision of this chapter or any rule, regulation, or order thereunder, or to aid in the enforcement of the provisions of this chapter or in prescribing rules or regulations thereunder, or in obtaining information to serve as a basis for recommending further legislation concerning the matters to which this chapter relates, or in obtaining information about the sale of electric energy at wholesale in interstate commerce and the transmission of electric energy in interstate commerce. The Commission may permit any person, electric utility, transmitting utility, or other entity to file with it a statement in writing under oath or otherwise, as it shall determine, as to any or all facts and circumstances concerning a matter which may be the subject of investigation. The Commission, in its discretion, may publish or make available to

not otherwise subject to the jurisdiction of the Commission, including the generation, transmission, distribution, and sale of electric energy by any agency, authority, or instrumentality of the United States, or of any State or municipality or other political subdivision of a State. It shall, so far as practicable, secure and keep current information regarding the ownership, operation, management, and control of all facilities for such generation, transmission, distribution, and sale; the capacity and output thereof and the relationship between the two; the cost of generation, transmission, and distribution; the rates, charges, and contracts in respect of the sale of electric energy and its service to residential, rural, commercial, and industrial consumers and other purchasers by private and public agencies; and the relation of any or all such facts to the development of navigation, industry, commerce, and the national defense. The Commission shall report to Congress the results of investigations made under authority of this section.

(June 10, 1920, ch. 285, pt. III, § 311, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 859.)

## § 825k. Publication and sale of reports

The Commission may provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use, and is authorized to sell at reasonable prices copies of all maps, atlases, and reports as it may from time to time publish. Such reasonable prices may include the cost of compilation, composition, and reproduction. The Commission is also authorized to make such charges as it deems reasonable for special statistical services and other special or periodic services. The amounts collected under this section shall be deposited in the Treasury to the credit of miscellaneous receipts. All printing for the Federal Power Commission making use of engraving, lithography, and photolithography, together with the plates for the same, shall be contracted for and performed under the direction of the Commission, under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe, and all other printing for the Commission shall be done by the Director of the Government Publishing Office under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe. The entire work may be done at, or ordered through, the Government Publishing Office whenever, in the judgment of the Joint Committee on Printing, the same would be to the interest of the Government: *Provided*, That when the exigencies of the public service so require, the Joint Committee on Printing may authorize the Commission to make immediate contracts for engraving, lithographing, and photolithographing, without advertisement for proposals: *Provided further*, That nothing contained in this chapter or any other Act shall prevent the Federal Power Commission from placing orders with other departments or establishments for engraving, lithographing, and photolithographing, in accordance with the provisions of sections 1535 and 1536 of title 31, providing for interdepartmental work.

(June 10, 1920, ch. 285, pt. III, § 312, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 859; amended Pub. L. 113–235, div. H, title I, § 1301(b), (d), Dec. 16, 2014, 128 Stat. 2537.)

### Editorial Notes

#### Codification

"Sections 1535 and 1536 of title 31" substituted in text for "sections 601 and 602 of the Act of June 30, 1932 (47 Stat. 417 [31 U.S.C. 686, 686b])" on authority of Pub. L. 97–258, § 4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

### Statutory Notes and Related Subsidiaries

#### Change of Name

"Director of the Government Publishing Office" substituted for "Public Printer" in text on authority of section 1301(d) of Pub. L. 113–235, set out as a note under section 301 of Title 44, Public Printing and Documents.

"Government Publishing Office" substituted for "Government Printing Office" in text on authority of section 1301(b) of Pub. L. 113–235, set out as a note preceding section 301 of Title 44, Public Printing and Documents.

## § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be

modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission's order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, §313, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 860; amended June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 85–791, §16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, §1284(c), Aug. 8, 2005, 119 Stat. 980.)

### Editorial Notes

#### Codification

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

#### Amendments

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless

such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, §16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, §16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

#### Statutory Notes and Related Subsidiaries

##### Change of Name

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

## § 825m. Enforcement provisions

**(a) Enjoining and restraining violations**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter.

**(b) Writs of mandamus**

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

**(c) Employment of attorneys**

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

**(d) Prohibitions on violators**

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of

(F) The Market Monitoring Unit and its employees may not accept anything of value from a market participant in excess of a *de minimis* amount.

(G) The Market Monitoring Unit and its employees must advise a supervisor in the event they seek employment with a market participant, and must disqualify themselves from participating in any matter that would have an effect on the financial interest of the market participant.

(4) *Electronic delivery of data.* Each Commission-approved regional transmission organization and independent system operator must electronically deliver to the Commission, on an ongoing basis and in a form and manner consistent with its own collection of data and in a form and manner acceptable to the Commission, data related to the markets that the regional transmission organization or independent system operator administers.

(5) *Offer and bid data.* (i) Unless a Commission-approved independent system operator or regional transmission organization obtains Commission approval for a different period, each Commission-approved independent system operator and regional transmission organization must release its offer and bid data within three months.

(ii) A Commission-approved independent system operator or regional transmission organization must mask the identity of market participants when releasing offer and bid data. The Commission-approved independent system operators and regional transmission organization may propose a time period for eventual unmasking.

(6) *Responsiveness of Commission-approved independent system operators and regional transmission organizations.* Each Commission-approved independent system operator or regional transmission organization must adopt business practices and procedures that achieve Commission-approved independent system operator and regional transmission organization board of directors' responsiveness to customers and other stakeholders and satisfy the following criteria:

(i) *Inclusiveness.* The business practices and procedures must ensure that any customer or other stakeholder affected by the operation of the Commis-

sion-approved independent system operator or regional transmission organization, or its representative, is permitted to communicate the customer's or other stakeholder's views to the independent system operator's or regional transmission organization's board of directors;

(ii) *Fairness in balancing diverse interests.* The business practices and procedures must ensure that the interests of customers or other stakeholders are equitably considered, and that deliberation and consideration of Commission-approved independent system operator's and regional transmission organization's issues are not dominated by any single stakeholder category;

(iii) *Representation of minority positions.* The business practices and procedures must ensure that, in instances where stakeholders are not in total agreement on a particular issue, minority positions are communicated to the Commission-approved independent system operator's and regional transmission organization's board of directors at the same time as majority positions; and

(iv) *Ongoing responsiveness.* The business practices and procedures must provide for stakeholder input into the Commission-approved independent system operator's or regional transmission organization's decisions as well as mechanisms to provide feedback to stakeholders to ensure that information exchange and communication continue over time.

(7) *Compliance filings.* All Commission-approved independent system operators and regional transmission organizations must make a compliance filing with the Commission as described in Order No. 719 under the following schedule:

(i) The compliance filing addressing the accepting of bids from demand response resources in markets for ancillary services on a basis comparable to other resources, removal of deviation charges, aggregation of retail customers, shortage pricing during periods of operating reserve shortage, long-term power contracting in organized markets, Market Monitoring Units,

PJM Interconnection, L.L.C.,Intra-PJM Tariffs
Filing Category:          Normal                          Filing Date:              05/04/2018
FERC Docket:             ER18-01528-000                  FERC Action:              Accept
FERC Order:              Delegated Letter Order            Order Date:
     06/25/2018
Effective Date:           07/03/2018                        Status:              Effective
ATTACHMENT M, OATT ATTACHMENT M (5.0.0)

# ATTACHMENT M
# PJM MARKET MONITORING PLAN

References to section numbers in this Attachment M refer to sections of this Attachment M, unless otherwise specified.

. . .

## III.    MARKET MONITORING UNIT

**A.    Establishment:**  PJM shall establish or retain a Market Monitoring Unit to perform the functions set forth in this Plan.

**B.    Composition:**  The Market Monitoring Unit shall be comprised of personnel having the experience and qualifications necessary to implement this Plan. In carrying out its responsibilities, the Market Monitoring Unit may retain such consultants, attorneys and experts as it deems necessary.

**C.    Independence:**  The Market Monitoring Unit shall be independent from, and not subject to, the direction or supervision of any person or entity, with the exception of the PJM Board as specified in section III.D above, and the Commission.   No person or entity shall have the right to preview, screen, alter, delete, or otherwise exercise editorial control over or delay Market Monitoring Unit actions or investigations or the findings, conclusions, and recommendations developed by the Market Monitoring Unit that fall within the scope of market monitoring responsibilities contained in this Plan.   Nothing in this section shall be interpreted to exempt the Market Monitoring Unit from any applicable provision of state or federal law.

**D.    Role of PJM Board:**

1.    The PJM Board shall have the authority and responsibility:

a.    To review the budget of the Market Monitoring Unit, consistent with the budget processes and requirements set forth in section III.E below.

b.    To propose to terminate, retain by contract renewal or replace the Market Monitoring Unit, consistent with the requirements of section III.F below.

**A - 13**

2.    The PJM Board and the Market Monitor shall meet and confer from time to time on matters relevant to the discharge of the PJM Board's and the Market Monitoring Unit's duties under this Plan.

3.    Other than the matters set forth in sections III.D.1 and D.2 above, the PJM Board shall have no responsibility for, or authority over, the Market Monitoring Unit.

. . .

**I.    PJM Liaison:**  PJM may appoint an employee to act as liaison with the Market Monitoring Unit.   The function of the liaison will be to facilitate communications between PJM employees and the Market Monitoring Unit, as defined in section V.E below.

## IV.    MARKET MONITORING UNIT FUNCTIONS AND RESPONSIBILITIES

**A.    General:**    The Market Monitoring Unit shall objectively monitor the competitiveness of PJM Markets, investigate violations of FERC or PJM Market Rules, recommend changes to PJM Market Rules, prepare reports for the Authorized Government Agencies and take such other actions as are specified in this Plan.

**B.    Monitored Activities:**   The Market Monitoring Unit shall be responsible for monitoring the following:

1.    Compliance with the PJM Market Rules.

2.    Actual or potential design flaws in the PJM Market Rules.

3.    Structural problems in the PJM Markets that may inhibit a robust and competitive market.

4.    The potential for a Market Participant to exercise market power or violate any of the PJM or FERC Market Rules or the actual exercise of market power or violation of the PJM or FERC Market Rules.

5.    PJM's implementation of the PJM Market Rules or operation of the PJM Markets, as further set forth in section IV.C below.

6.    Such matters as are necessary to prepare the reports set forth in Section VI.

. . .

**G.    Participation in Stakeholder Processes:**   The Market Monitoring Unit may, as it deems appropriate or necessary to perform its functions under this Plan, participate (consistent with the rules applicable to all PJM stakeholders) in stakeholder working groups, committees or other PJM stakeholder processes.

**A - 14**

**H.    Reports of Wrongdoing to State Commissions**:   If during the ordinary course of its activities the Market Monitoring Unit discovers evidence of wrongdoing (other than minor misconduct) that the Market Monitor reasonably believes to be within a State Commission's jurisdiction, the Market Monitoring Unit shall report such information to the State Commission(s).

. . .

**J.    Additional Market Monitoring Unit Authority**:   In addition to notifications and Referrals under sections IV.I.1 and IV.I.2 above, respectively, the Market Monitoring Unit shall have the additional authority described in this section, as follows:

1.    Engage in discussions regarding issues relating to the PJM Market Rules or FERC Market Rules, in order to understand such issues and to attempt to resolve informally such issues or other issues.

2.    Excepting matters governed by section IV.I above, file reports and make appropriate regulatory filings with Authorized Government Agencies to address design flaws, structural problems, compliance, market power, or other issues, and seek such appropriate action or make such recommendations as the Market Monitoring Unit shall deem appropriate. The Market Monitoring Unit shall make such filings or reports publicly available and provide simultaneous notice of the existence of reports to the PJM members and PJM, subject to protection of confidential information.

3.    Consult with Authorized Government Agencies concerning the need for specific investigations or monitoring activities.

4.    Consider and evaluate a broad range of additional enforcement mechanisms that may be necessary to assure compliance with the PJM Market Rules.   As part of this evaluation process, the Market Monitoring Unit shall consult with Authorized Government Agencies and other interested parties.

5.    Report directly to the Commission staff on any matter.

. . .

## V.    INFORMATION AND DATA

A.    **Primary Information Sources:**   The Market Monitoring Unit shall rely primarily upon data and information that are customarily gathered in the normal course of business of PJM and such publicly available data and information that may be helpful to accomplish the objectives of the Plan, including, but not limited to, (1) information gathered or generated by PJM in connection with its scheduling and dispatch functions, its operation of the transmission grid in the PJM Region or its determination of Locational Marginal Prices, (2) information required to be provided to PJM in accordance with the PJM Market Rules and (3) any other information that is generated by, provided to, or in the possession of PJM.   The foregoing information shall be

A - 15

provided to the Market Monitoring Unit as soon as practicable, including, but not limited to, real-time access to scheduling, dispatch and other operational data.

B.  **Other Information Requests:**  If other information is required from a Market Participant, the Market Monitoring Unit shall comply with the following procedures:

1.  **Request for Additional Data:**  If the Market Monitoring Unit determines that additional information is required to accomplish the objectives of the Plan, the Market Monitoring Unit may make reasonable requests of the entities possessing such information to provide the information.  Any such request for additional information will be accompanied by an explanation of the need for the information and the Market Monitoring Unit's inability to acquire the information from alternate sources.

2.  **Failure to Comply with Request:**  The information request recipient shall provide the Market Monitoring Unit with all information that is reasonably requested.  If an information request recipient does not provide requested information within a reasonable time, the Market Monitoring Unit may initiate such regulatory or judicial proceedings to compel the production of such information as may be available and deemed appropriate by the Market Monitoring Unit, including petitioning the Commission for an order that the information is necessary and directing its production.  An information request recipient shall have the right to respond to any such petitions and participate in the proceedings thereon.

3.  **Information Concerning Possible Undue Preference:**  Notwithstanding subsection V.B.1 above, if the Market Monitoring Unit requests information relating to possible undue preference between Transmission Owners and their affiliates, Transmission Owners and their affiliates must provide requested information to the Market Monitoring Unit within a reasonable time, as specified by the Market Monitoring Unit; provided, however, that an information request recipient may petition the Commission for an order limiting all or part of the information request, in which event the Commission's order on the petition shall determine the extent of the information request recipient's obligation to comply with the disputed portion of the information request.

4.  **Confidentiality:**  Except as provided in section IV.K.3, above, of this Plan, the Market Monitoring Unit shall observe the confidentiality provisions of the PJM Operating Agreement and Tariff, Attachment M - Appendix with respect to information provided under this section if an entity providing the information designates it as confidential.

C.  **Complaints:**  Any Market Participant or other interested entity may at any time submit information to the Market Monitoring Unit concerning any matter relevant to the Market Monitoring Unit's responsibilities under the Plan, or may request the Market Monitoring Unit to make inquiry or take any action contemplated by the Plan.  Such submissions or requests may be made on a confidential basis.  The Market Monitoring Unit may request further information from such Market Participant or other entity and make such inquiry as the Market Monitoring Unit considers appropriate.  The Market Monitoring Unit shall not be required to act with respect to any specific complaint unless the Market Monitoring Unit determines action to be warranted.

D.    **Collection and Availability of Information:**    The Market Monitoring Unit shall regularly collect and maintain under its sole control the information that it deems necessary for implementing the Plan. A Market Participant shall have sole responsibility to make available to the Market Monitoring Unit any information that the Market Monitoring Unit deems reasonably necessary to document, verify or investigate a claim or request by such Market Participant. All load reduction data are subject to audit by the Market Monitoring Unit. The Market Monitoring Unit shall make publicly available a detailed description of the categories of data collected by the Market Monitoring Unit.    To the extent it deems appropriate and upon specific request, the Market Monitoring Unit may release other data to the public, consistent with the obligations of the Market Monitoring Unit and PJM to protect confidential, proprietary, or commercially sensitive information as provided in Tariff, Attachment M - Appendix and the PJM Operating Agreement.

E.    **Access to Personnel and Facilities:**    The Market Monitoring Unit shall have access to PJM personnel and facilities as necessary to perform the functions set forth in this Plan. If the Market Monitoring Unit seeks data or other information from PJM personnel, it may contact the appropriate personnel that may be in possession of such data or information.    If the Market Monitoring Unit seeks a formal opinion or position on a matter from PJM, it shall contact the PJM Liaison or appropriate senior management official to provide such opinion or position.

F.    **Market Monitoring Indices:**    The Market Monitoring Unit shall develop, and shall refine on the basis of experience, indices or other standards to evaluate the information that it collects and maintains.    Prior to using any such index or standard, the Market Monitoring Unit shall provide PJM members, Authorized Government Agencies, and other interested parties an opportunity to comment on the appropriateness of such index or standard.    Following such opportunity for comments, the decision to use any index or standard shall be solely that of the Market Monitoring Unit.

G.    **Evaluation of Information:**    The Market Monitoring Unit shall evaluate, and shall refine on the basis of experience, the information it collects and maintains, or that it receives from other sources, regarding the operation of the PJM Markets or other matters relevant to the Plan.    As so evaluated, such information shall provide the basis for reports or other actions of the Market Monitoring Unit under this Plan.

. . .

A - 17

PJM Interconnection, L.L.C.,Rate Schedules
Filing Category:        Normal                          Filing Date:            09/07/2018
FERC Docket:            ER18-02402-000                  FERC Action:            Accept
FERC Order:             Delegated Letter Order          Order Date:
        11/05/2018
Effective Date:         01/01/2020                      Status:                 Effective
MMSA-46 Sec 13, MMSA-46 Sec 13 - Independent Contractor (2.0.0)

**13.    Independent Contractor.**

    Nothing herein shall be construed to create an employer-employee relationship between PJM and IMM or any of IMM's employees.   IMM is an independent contractor and not an employee of PJM or any of its subsidiaries or affiliates.   The consideration set forth in section 5 of this Agreement shall be the sole consideration due to IMM for the Services rendered hereunder.   IMM and IMM's employees will not represent to be or hold themselves out as employees of PJM.   No workers' compensation insurance shall be obtained by PJM covering IMM or IMM's employees.

PJM Interconnection, L.L.C., Rate Schedules

| | | | |
|---|---|---|---|
| Filing Category: | Normal | Filing Date: | 07/29/2013 |
| FERC Docket: | ER13-02052-000 | FERC Action: | Accept |
| FERC Order: | 144 FERC ¶ 61,238 (2013) | Order Date: | 09/27/2013 |
| Effective Date: | 09/27/2013 | Status: | Effective |

MMSA-46 Sec 28, MMSA-46 Sec 28 - Communication and Cooperation (0.0.0)

## 28.    Communication and Cooperation.

In order to facilitate communication and to help ensure that the PJM Board is aware of IMM concerns and that the IMM is aware of PJM Board concerns, the PJM Board, or a subcommittee thereof, and the IMM will meet at each PJM Board meeting during the year and at additional times if requested by the PJM Board. PJM Board members may call the Market Monitor at any time with questions about the positions of the IMM or any other matter of concern to the PJM Board.

The PJM Board, or a subcommittee thereof, and IMM shall meet periodically, not less than annually, to review whether any changes to the Agreement are necessary or desirable.

In order to continue cooperative interaction between PJM and IMM, the Parties have jointly drafted a document setting out the Parties' intent, "Protocol for Improved Interaction," which has been posted on the PJM and IMM websites. The Parties are committed to continuing to communicate effectively.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 28, 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>*/s/ Jason T. Perkins*</u>
Jason T. Perkins
Attorney